

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

### NO. PD-1076-14

---

**RICARDO BELTRAN, Appellant**

**v.**

**THE STATE OF TEXAS**

---

### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE FIFTH COURT OF APPEALS
### DALLAS COUNTY

---

**RICHARDSON, J., delivered the opinion for a unanimous Court.**

### O P I N I O N

Ricardo Beltran was convicted by a jury of murder and sentenced to seventy years' imprisonment. In a single issue on direct appeal, Beltran asserted that the trial court erred in denying his request for an instruction on sudden passion. The Fifth Court of Appeals affirmed his conviction, holding that the trial court did not err in refusing to give the instruction because there was no evidence that Beltran caused the victim's death under the immediate influence of sudden passion. We disagree and hold that Beltran was entitled to

an instruction on sudden passion. We reverse the judgment of the Court of Appeals and remand this case for a harm analysis in accordance with *Almanza v. State*.[1]

## BACKGROUND

### A. *Ricardo Beltran's Testimony*

The only witness to the death of Sheldon McKnight who testified at appellant's trial was appellant, Ricardo Beltran. According to Beltran, on the evening of the murder, he contacted Victor Ramos to buy some heroin. Before meeting with Ramos, Beltran met up with another friend, Alprintice Green, at a DART ("Dallas Area Rapid Transit") station and boarded a train to meet Ramos. Along the way, Beltran and Green stopped near McKnight's apartment so that Green could buy Xanax from McKnight. Beltran testified that he had never met McKnight and did not speak to McKnight at that time. From there, Beltran and Green went to a park where they consumed the Xanax, and then they walked to Ramos's apartment complex to meet Ramos. When they met Ramos at his apartment complex, the three men sat outside and started "getting high" and drinking Jack Daniels. At some point, Green expressed a desire to go home, so Ramos arranged for McKnight to pick them up. McKnight arrived, and the three men got into McKnight's car. McKnight drove Green home, and Beltran then asked to be dropped off at his home, but he changed his mind when Ramos offered to sell him more heroin.

---

[1] 686 S.W.2d 157 (Tex. Crim. App. 1984).

The three men (McKnight, Beltran, and Ramos) then went to McKnight's apartment. McKnight went upstairs while Ramos and Beltran continued to consume more drugs. After a time, McKnight came downstairs to sit on the couch next to Beltran, stroked his face, and told Beltran he was a "pretty little thing." At that point, Beltran asked Ramos to take him home, but Ramos said that they needed to "chill," and McKnight went back upstairs. Ramos and Beltran resumed snorting heroin. McKnight then came back downstairs and told Beltran and Ramos that they had to go upstairs because McKnight was expecting "company." Beltran and Ramos went upstairs while McKnight stayed downstairs. Once upstairs, Beltran and Ramos consumed more drugs. Ramos then went downstairs, leaving Beltran on the bed upstairs. Beltran said that he took off his shoes, laid down, and passed out, with all of his clothes on.

Beltran testified that he was awakened by McKnight "behind him." Beltran was naked from the waist down, and McKnight was licking Beltran's anus. Beltran testified that McKnight was not wearing any clothes.[2] Beltran said that he "panicked" and "moved" and "all of a sudden [McKnight] jumped on top" of him. Beltran said he was screaming "in panic, not knowing what was going on." Beltran testified that he was facing down and McKnight was "pushing [his] face down [into the pillow] trying to shut [him] up," and that,

_____

[2] There was evidence at trial that the body of McKnight was found wearing only a woman's negligee top and pink panties.

"all of a sudden," he felt McKnight fall on top of him. Beltran then stated that, "all of a sudden" Ramos was there and had hit McKnight with something. Beltran admitted to being "light-headed" and having "blurred vision," and that he was "trying to get up," and Ramos was "trying to pull [him] from underneath." McKnight then grabbed Ramos, and Beltran said that he "grabbed" McKnight from behind and told Ramos to "get some help." Beltran then testified that "all of a sudden," Ramos started stabbing McKnight, who was "kicking" and "reacting crazy." Beltran said that he continued to tell Ramos to get help, but Ramos just "continued stabbing the man." Beltran held tight to McKnight to "protect" Ramos and himself. Beltran just "closed his eyes for awhile," and Ramos "was still stabbing" McKnight. After they realized McKnight was dead, Beltran, who was "totally naked" and "full of blood everywhere," "just started crying."

Beltran decided to take some of McKnight's clothes since his were covered in blood. Beltran testified that he was "totally shocked," "freaking out," and was "scared." He and Ramos left McKnight's apartment, but returned when Beltran realized that he had left his clothes there. Ramos then suggested that they "make it seem like a robbery," and "take the man's belongings." Beltran said that he wanted to leave quickly, so the two loaded McKnight's car with items from his apartment and drove away in McKnight's car. Beltran then went home and took a shower.

In response to questions regarding what his intentions were that night, Beltran denied

that he intended to rob and kill McKnight, he denied killing or stabbing McKnight, he denied knowing where Ramos got the knife used to stab McKnight, and he denied that he intended to help Ramos kill McKnight.

B.   *The Jury Charge*

Beltran was charged with capital murder—causing the death of McKnight while in the course of committing or attempting to commit robbery.  The jury was charged that Beltran could be convicted of either capital murder, or the lesser-included offense of murder, as a principal or as a party.[3]  The jury was also given a self-defense charge, but, having found Beltran guilty of the lesser-included offense of murder, the jury obviously rejected self-defense.

Following the punishment phase of the trial, Beltran requested that the court include an instruction on sudden passion.[4]  However, the trial court disagreed that Beltran was

---

[3] The parties instruction in the jury charge, patterned after TEX. PENAL CODE § 7.02(a)(2), read as follows:

> All persons are parties to an offense who are guilty of acting together in the commission of an offense.  A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both.  A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he encourages, aids, or attempts to aid the other person to commit the offense.  Mere presence alone will not make a person a party to an offense.

[4] Beltran's attorney argued that "[t]he jury is entitled to consider whether Ricardo Beltran acted out of immediate influence of sudden passion caused by the acts of Sheldon McKnight including removing Mr. Beltran's clothes while he was unconscious, licking his anus, smothering him with a pillow and the resulting fight and that Ricardo Beltran's actions were caused directly by this which action was on the defense."

entitled to a sudden passion instruction.[5]  In the absence of a sudden passion instruction, which would have capped the available punishment at 20 years' imprisonment, the jury assessed punishment at 70 years' imprisonment.

## C.    *The Opinion of the Court of Appeals*

On direct appeal, Beltran raised only one issue—that the trial court erred in denying his request for an instruction on sudden passion.  The appellate court disagreed with Beltran's argument that his testimony was more than enough evidence to justify a sudden passion instruction.  The appellate court stated that, to justify an instruction on sudden passion, the record "must contain some evidence that the defendant acted in an excited and agitated state of mind at the time of the killing."  The appellate court held that the record "reflect[ed] the contrary," concluding that "there is no evidence Beltran caused McKnight's death under the immediate influence of sudden passion" and that "the record does not 'minimally support' a causal connection between the provocation and homicide."[6]

---

[5] The trial judge stated that, "One, the defendant in both direct and in—on guilt/innocence, rather, and punishment denied the killing of the decedent, in fact in punishment testimony he said those words that he did not do the killing.  Two, on the defendant's testimony in direct, he stated that the decedent was getting off of him, the decedent was going toward Victor, then that's when he grabbed the defendant [*sic*].  So the Court rules that adequate caught [*sic*], sudden passion is not applicable here."

[6] *Beltran v. State*, No. 05-12-01647-CR, 2014 WL 3587367, *2 (Tex. App.—Dallas 2014) (mem. op., not designated for publication) (citing to *Wooten v. State*, 400 S.W.3d 601, 605 (Tex. Crim. App. 2013)).

## ANALYSIS

We granted Beltran's petition for discretionary review to determine whether the Fifth Court of Appeals erred in holding that the trial court correctly denied Beltran's request for a sudden passion instruction.[7]

*A.*     *The Law On Sudden Passion*

Texas Penal Code Section 19.02(d) provides that,

> at the punishment stage of a trial, the defendant may raise the issue as to whether he caused the death under the immediate influence of sudden passion arising from an adequate cause. If the defendant proves the issue in the affirmative by a preponderance of the evidence, the offense is a felony of the second degree.

Section 19.02(a)(1) defines "adequate cause" as "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." Section 19.02(a)(2) defines "sudden passion" as passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation."

In June of 2013, this Court unanimously decided the case of *Wooten v. State*.[8] The defendant in *Wooten* was convicted of murder and sentenced to 60 years' imprisonment. In

---

[7] Specifically, we granted review on the following issue: "Whether, for purposes of determining whether an appellant was entitled to a jury instruction on sudden passion, some evidence that he acted in self-defense negates all evidence that he acted in sudden passion."

[8] 400 S.W.3d 601 (Tex. Crim. App. 2013).

*Wooten*, as in this case, the defendant's request for a sudden passion instruction was rejected.

The Fourteenth Court of Appeals affirmed Wooten's conviction, but reversed the trial court's judgment as to punishment, holding that the trial court committed harmful error by not including a sudden passion instruction. We reversed that decision, and held that the error did not harm the defendant. In our *Wooten* opinion, we included a comprehensive overview of the law on sudden passion:

> Prior to September 1, 1994, whether a defendant committed murder under the immediate influence of sudden passion arising from an adequate cause was an issue that was litigated at the guilt phase of the trial. If the evidence raised the issue of sudden passion, the question was submitted to the jury, and it had the option of finding the defendant guilty of the lesser offense of voluntary manslaughter. Because of certain anomalies generated by this framework, the Legislature acted in 1993 to remove the crime of voluntary manslaughter from the Texas Penal Code. Under the current statutory scheme, the question of whether a defendant killed while under the immediate influence of sudden passion is a punishment issue.
>
> . . . The defendant has the burden of production and persuasion with respect to the issue of sudden passion. To justify a jury instruction on the issue of sudden passion at the punishment phase, the record must at least minimally support an inference: 1) that the defendant in fact acted under the immediate influence of a passion such as terror, anger, rage, or resentment; 2) that his sudden passion was in fact induced by some provocation by the deceased or another acting with him, which provocation would commonly produce such a passion in a person of ordinary temper; 3) that he committed the murder before regaining his capacity for cool reflection; and 4) that a causal connection existed "between the provocation, passion, and homicide." It does not matter that the evidence supporting the submission of a sudden passion instruction may be weak, impeached, contradicted, or unbelievable. If the evidence thus raises the issue from any source, during either phase of trial, then the defendant

has satisfied his burden of production, and the trial court must submit the issue in the jury charge–at least if the defendant requests it.[9]

A defendant's testimony alone is sufficient to raise a defensive issue requiring an instruction in the charge.[10] Moreover, sudden passion and self-defense are not mutually exclusive.[11] A jury's rejection of self-defense at the guilt/innocence phase does not preclude submission of a sudden passion issue at the punishment phase.[12] Before we address whether Beltran raised the issue of sudden passion, we must first discuss whether the law of parties impacts our analysis.

B.     *The Law Of Parties—Whose Passion Must Be Sudden?*

A person is a criminally responsible party to an offense "if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both."[13] Texas Penal Code Section 7.02, titled "Criminal Responsibility for Conduct of Another," provides that "(a) [a] person is criminally responsible for an offense committed by the conduct of another if: . . . (2) acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to

---

[9] *Wooten*, 400 S.W.3d at 604-05 (footnotes omitted).

[10] *Shaw v. State*, 243 S.W.3d 647, 662 (Tex. Crim. App. 2007).

[11] *Medlock v. State*, 591 S.W.2d 485, 487 (Tex. Crim. App. 1979).

[12] *See Trevino v. State*, 100 S.W.3d 232, 242-43 (Tex. Crim. App. 2003) (stating that "jury's rejection of self-defense at guilt innocence does not necessarily mean that, given an instruction on sudden passion at punishment, it would have rejected that theory as well").

[13] TEX. PENAL CODE § 7.01.

commit the offense." Circumstantial evidence may be used to prove party status.[14] There must be sufficient evidence of an understanding and common design to commit the offense.[15]

The State's theory of the case, as set out in its opening statement and as argued in closing, was that both Ricardo Beltran and Victor Ramos acted together in killing McKnight during the course of robbing him. The court's charge to the jurors instructed them that, in order to find Beltran guilty, they must find from the evidence beyond a reasonable doubt that Ricardo Beltran intentionally caused the death of Sheldon McKnight by stabbing or striking him, or they must find from the evidence beyond a reasonable doubt that Ricardo Beltran, "acting as a party with the intent to promote or assist Victor Ramos" in commission of the offense, "solicited, encourage, directed, aided, or attempted to aid Victor Ramos," in intentionally causing the death of Sheldon McKnight by stabbing or striking him. Either way, the jurors were charged with deciding whether Beltran was guilty of causing the death of Sheldon McKnight, either as the one who did the stabbing, or acting as a party with Ramos, who did the stabbing.

The State argues that a sudden passion instruction was not warranted because, "while Beltran's having been subjected to having his anus licked by McKnight and having had his face pushed into a pillow might have been the type of conduct that could have justified

---

[14] *Gross v. State*, 380 S.W.3d 181, 186 (Tex. Crim. App. 2012) (citing to *Ransom v. State*, 920 S.W.2d 288, 302 (Tex. Crim. App. 1996)).

[15] *Id.* (citing to *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004)).

Beltran's having been rendered incapable of cool reflection, the record is devoid of any evidence that Ramos was subjected to those actions or that Ramos had even known what had caused Beltran initially to scream."[16] The State asserts that there are no grounds to conclude that Ramos's actions had been committed while Ramos was under the influence of sudden passion.

This case presents the unique question of whether the law of parties, which clearly applied in the guilt/innocence phase of this trial, applies to the issue of whether a sudden passion instruction should have been given in the punishment phase of the trial. In other words, must we look to Beltran's conduct to determine whether *he* was acting under the influence of sudden passion, or must we look to Ramos's conduct to determine whether *Ramos* was acting under the influence of sudden passion, derivatively entitling Beltran to a sudden passion instruction under the law of parties?

According to Beltran, Ramos did all of the striking and the stabbing. But there was no evidence as to what prompted Ramos to act. We can assume it was Beltran's screams for help, but even Beltran's testimony does not inform us what was in Ramos's mind. There is no evidence that McKnight provoked Ramos into reacting with sudden passion. The provocation coming from McKnight, if any, was initially directed toward Beltran. Beltran's

---

[16] Brief for the State at 18, *Beltran v. State*, No. 05-12-01647 CR, 2014 WL 3587367 (Tex. App.—Dallas 2014).

testimony indicates that McKnight's struggle with Ramos was in response to Ramos's attack of McKnight.

The interplay between the law of parties and sudden passion is an issue of first impression. For guidance, we looked to the early line of capital murder death penalty cases wherein this Court explained that the law of parties did not apply at the punishment phase of the trial.[17] In *Webb v. State*,[18] the defendant was convicted of capital murder and sentenced to death. We held that the death penalty could be imposed even though the defendant might have been convicted as a party to capital murder. There was ample evidence to support the appellant's conviction either as a primary actor or as a party to the intentional killing of the deceased. A reasonable jury could have found the appellant guilty of causing the death of the victim either intentionally, or by soliciting, directing, encouraging or aiding his accomplice to do so. When it came to punishment, however, we reiterated that "the law of parties does not apply at the punishment phase of a capital murder trial."[19] This meant

---

[17] *See Green v. State*, 840 S.W.2d 394, 409 (Tex. Crim. App. 1992), *overruled on other grounds by Trevino v. State*, 991 S.W.2d 849, 853 (Tex. Crim. App. 1999) ("While the law of parties has long been held to apply to capital cases, it does not so apply in the punishment phase. Therefore, the jury is required to make their determination based solely on the behavior and perceived intent of appellant and *not* the actions or intent of his co-defendant.") (emphasis in original) (citing to *Green v. State*, 682 S.W.2d 271, 287 n. 4 (Tex. Crim. App. 1984); *Ex parte Jacobs*, 843 S.W.2d 517, 519 (Tex. Crim. App. 1992) (holding that "a defendant in a capital case can act 'deliberately' . . . without proof that he actually did the shooting"); *Belyeu v. State*, 791 S.W.2d 66, 74 (Tex. Crim. App. 1989) (holding that the law of parties does not apply to punishment phase even though in a capital murder trial a non-triggerman can be guilty of deliberate conduct that would support a sentence of death because each actor can engage in deliberate conduct).

[18] 760 S.W.2d 263, 267-68 (Tex. Crim. App. 1988).

[19] *Id.* at 267 n. 8 (citing to *Green v. State*, 682 S.W.2d 271, 287 (Tex. Crim. App. 1984)).

that, in the punishment phase of a death penalty capital murder trial where the defendant is convicted as a party to the offense, the conduct of the primary actor is not relevant to whether the defendant acted "deliberately."[20] Rather, it is the defendant's conduct by which he "solicited, encouraged, directed, aided or attempted to aid" the perpetration of the intentional murder that is relevant.[21]

We hold that this same reasoning applies in non-death penalty cases when a defendant, who has been convicted under the law of parties, requests that a sudden passion instruction

---

[20] Prior to its amendment in 1991, Texas Code of Criminal Procedure Article 37.071(b) provided, in pertinent part, that, "[o]n conclusion of the presentation of the evidence, the court shall submit the following three issues to the jury: (1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result." Texas Code of Criminal Procedure Article 37.071 was amended in 1991, changing subsection (b) to incorporate the following "anti-parties" language into the second special issue to the jury in determining whether the defendant should be sentenced to death: "On conclusion of the presentation of the evidence, the court shall submit the following issues to the jury: . . . (2) in cases in which the jury charge at the guilt or innocence stage permitted the jury to find the defendant guilty as a party under Sections 7.01 and 7.02, Penal Code, whether the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken." Act effective September 1, 1991, 72nd Leg., R.S., ch. 838, § 1, 1991 Tex. Gen. Laws 2898, 2899 (codified at TEX. CRIM. CODE PROC. art. 37.071(b)).

[21] *Webb*, 760 S.W.2d at 267-68 (citing to *Cuevas v. State,* 742 S.W.2d 331, 343 (Tex. Crim. App. 1987) (reprising our holding in *Green v. State*) (emphasis in original)):

Of course, application of the law of parties at the guilt phase means it is possible for a non-triggerman, such as [the defendant], to be convicted of a capital offense. However, a capital defendant will be assessed the death penalty only if the jury answers the special issues of Art. 37.071(b) in the affirmative. Special issue number one requires the jury to determine "whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result." Because the law of parties may not be applied in answering this issue, an affirmative verdict is possible only when the jury finds that the defendant's *own* conduct satisfies both parts of special issue number one.

be included in the punishment charge to the jury. In *Rogers v. State*,[22] we noted that relevancy in the punishment phase is "a question of what is helpful to the jury in determining the appropriate sentence for a particular defendant in a particular case."[23] The sentencing phase presents different issues than those contemplated in the guilt/innocence phase.[24] "Unlike the guilt phase, 'the question at punishment is not whether the defendant has committed a crime, but instead, what sentence should be assessed.'"[25]

The law of parties applies to the determination of whether a defendant can be found guilty, either acting alone or together with another as a party, for having caused the death of the victim. In other words, if a defendant is found guilty as a party, that defendant is found to have "caused the death" of the victim. In punishment, the law of sudden passion applies to the determination of whether that defendant "caused the death" while acting under the immediate influence of sudden passion arising from an adequate cause. In this case, as charged to the jury, Beltran's conduct was relevant to the determination of whether he was acting alone or as a party with Ramos in causing the death of McKnight. Thus, it is Beltran's

---

[22] 991 S.W.2d 263 (Tex. Crim. App. 1999).

[23] *Webb*, 760 S.W.2d at 265; *Sunbury v. State*, 88 S.W.3d 229, 232 (Tex. Crim. App. 2002); *Mendiola v. State*, 21 S.W.3d 282, 284-85 (Tex. Crim. App. 2000).

[24] *Rogers,* 991 S.W.2d at 265.

[25] *Ellison v. State*, 201 S.W.3d 714, 718 (Tex. Crim. App. 2006) (citing to *Haley v. State*, 173 S.W.3d 510, 515 (Tex. Crim. App. 2005); *Sunbury*, 88 S.W.3d at 234; *Rogers*, 991 S.W.2d at 265).

conduct that is pertinent to whether he acted under the immediate influence of sudden passion.

Therefore, the derivative aspect of the law of parties (criminal responsibility *for the conduct of another*) does not factor into whether a defendant is entitled to an instruction on sudden passion. Sudden passion is a mitigating circumstance that is relevant to determining the appropriate punishment of a defendant. Thus, it is the defendant's conduct by which he "act[s] with intent to promote or assist the commission of the offense," and by which "he encourages, aids, or attempts to aid the other person to commit the offense" that is determinative of whether he is entitled to a sudden passion instruction. In this case, therefore, we look to Beltran's conduct, not the conduct of Ramos, to determine whether Beltran was entitled to the sudden passion instruction.[26]

## C.    *Was Sudden Passion Sufficiently Raised By Beltran?*

The trial court reasoned that, because Beltran denied killing McKnight, he was not entitled to a sudden passion instruction. However, the appellate court did not address that conclusion drawn by the trial court. Our job is to analyze the basis for the appellate court's decision, not the basis for the trial court's decision (if it differs from that of the appellate

---

[26] As we have stated, the jury could have found Beltran guilty either as the principal actor or as a party. In other words, in finding Beltran guilty, the jury necessarily found beyond a reasonable doubt that Beltran was either doing the stabbing, or he was acting with intent to promote or assist the stabbing by encouraging, aiding, or attempting to aid Ramos in doing the stabbing. Thus, to the extent that Beltran was acting as a party to the murder, he may still have been doing so under the influence of sudden passion, and he was entitled to have the jury consider that.

court).[27]  The court of appeals held that "Beltran's testimony that he moved away from McKnight, grabbed and held McKnight to keep McKnight from him and Ramos, and told Ramos to get help shows Beltran was consciously aware of the danger McKnight posed, tried to get control of the situation, and acted with thought, not in an excited and agitated state."[28]

An appellate court's duty is to look at the evidence supporting the charge of sudden passion, not the evidence refuting it.[29]  Even if the evidence is weak or impeached, a defendant is entitled to the sudden passion charge even if it is contradicted by the State's evidence.  If there is "some" evidence that a defendant acts with sudden passion, he is entitled to the charge.[30]

Our review of the record confirms that the only source from which it can be determined whether sudden passion was raised was Beltran's testimony.  If Beltran raised sudden passion through his testimony, then he satisfied his burden of production, and the trial court was required to submit the instruction to the jury in the punishment charge.

In order to have raised sudden passion, the defense would have had to put on some evidence: (1) that Beltran acted under the immediate influence of terror, anger, rage, or

---

[27] *Degrate v. State*, 712 S.W.2d 755, 756 (Tex. Crim. App. 1986) (holding that a discretionary review petition should specifically address the decision of the court of appeals).

[28] *Beltran*, 2014 WL 3587367 at *3.

[29] *Trevino v. State*, 100 S.W.3d at 239 (citing to *Sanchez v. State*, 745 S.W.2d 353, 357 (Tex. Crim. App. 1988)).

[30] *Id.* at 240.

resentment; (2) that Beltran's sudden passion was induced by some provocation by McKnight, and that such provocation would commonly produce such passion in a person of ordinary temper; (3) that Beltran committed the murder (in this case, as a party) before regaining his capacity for cool reflection; and (4) that there was a causal connection between McKnight's provocation, Beltran's passion, and the homicide.[31] We conclude that the appellate court failed to consider the evidence raising the issue of sudden passion and erroneously focused on the evidence tending to show that Beltran did not act under the immediate influence of sudden passion.

1.      Evidence of Beltran acting under the immediate influence of terror

We agree that there was no evidence that Beltran acted out of anger, rage, or resentment. There was, however, evidence of Beltran acting under the immediate influence of terror. Beltran testified that he "panicked," and that he was "screaming in panic." He testified that, at the time that he was grabbing McKnight from behind, which was at the same time that Ramos was stabbing McKnight, he told Ramos at least twice to "get some help." While we agree that this evidence may be weak and perhaps even unbelievable (as evidenced by the jury's rejection of self-defense), it was nevertheless enough to support an inference that Beltran acted under the immediate influence of terror.

---

[31] *Wooten*, 400 S.W.3d at 604-05.

2.      Evidence of Beltran's sudden passion being induced by provocation by McKnight, and whether such provocation would commonly produce such passion in a person of ordinary temper

Evidence of provocation by the decedent is required for a sudden passion charge.[32]

Beltran testified that he passed out on a bed, fully dressed, after a long night of heavy drug use. He then testified that he was awakened by a naked McKnight behind him licking his anus. Beltran's pants and underwear had been removed. Without more said, we hold that this was evidence of provocation by McKnight that would commonly produce sudden passion in a person of ordinary temper and thus was evidence of provocation sufficient to induce sudden passion in Beltran.

3.      Evidence of Beltran's conduct occurring before regaining his capacity for cool reflection

For a claim of fear to rise to the level of sudden passion, the defendant's mind must be rendered incapable of cool reflection.[33] Beltran's testimony suggested that his sudden awakening to being sexually assaulted by McKnight, his screams and panic in struggling to get out from underneath McKnight, Ramos's stabbing, and Beltran's grabbing of McKnight all occurred within a very brief time span. Beltran used the words "sudden" and "suddenly"

---

[32] *McKinney v. State*, 179 S.W.3d 565, 570 (Tex. Crim. App. 2005).

[33] *Gonzales v. State*, 717 S.W.2d 355, 357 (Tex. Crim. App. 1986); *Daniels v. State*, 645 S.W.2d 459, 460 (Tex. Crim. App. 1983) (noting that fear that rises to the level of terror may constitute sudden passion when its cause is such that would commonly produce a degree of terror "sufficient to render the mind incapable of cool reflection").

several times in his description of the incident.  Moreover, Beltran testified that he was "light-headed" and had "blurred vision" when Ramos came in to help Beltran get out from underneath McKnight.

It is possible that a jury could decide that there was a disconnect between the provocation by McKnight in sexually assaulting Beltran and Beltran's conduct in grabbing McKnight and holding him while Ramos continued stabbing McKnight.  Although Beltran's testimony may not have directly addressed whether Beltran grabbed McKnight and held him *because* McKnight had been sexually assaulting him, it is possible that a jury could decide that the sexual assault triggered a level of fear and panic in Beltran that continued throughout the entire struggle.  Thus, although arguably weak and possibly unbelievable, Beltran's testimony of fear and shock at being awakened in such a manner by McKnight, and in struggling with McKnight, supports Beltran's position that he was not capable of cool reflection.  In fact, Beltran's testimony suggests the absence of any cool reflection.

4.    Evidence of a causal connection between McKnight's provocation, Beltran's passion, and the homicide

The jury could arguably have deduced, from Beltran's testimony, that McKnight's sexual assault of Beltran and Beltran's sudden reaction to such sexual assault, triggered a chain reaction that resulted in McKnight's death:  Beltran was awakened by McKnight licking his anus and reacted by screaming in panic; McKnight pushed Beltran's face into the pillow to stop his screaming; Ramos presumably heard the screaming, entered the room,

purportedly to help Beltran, and hit McKnight in the head; McKnight then turned on Ramos, which prompted Beltran to grab McKnight and hold onto him; then Ramos suddenly started stabbing McKnight, and Beltran was in too much of a daze to have been capable of reflecting on what he was doing. This causal connection could be inferred from Beltran's testimony. Therefore, Beltran met this fourth requirement by raising evidence of a causal connection between McKnight's provocation, Beltran's passion, and the homicide.

## CONCLUSION

We hold that the Fifth Court of Appeals erred in affirming the trial court's denial of Beltran's request for a sudden passion charge. Accordingly, we reverse the judgment of the Court of Appeals and remand this case for a harm analysis in accordance with *Almanza v. State*.[34]

DELIVERED: October 14, 2015
PUBLISH

---

[34] 686 S.W.2d 157 (Tex. Crim. App. 1984).