**Reverse and Remand; Opinion Filed July 7, 2016.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-12-01647-CR

## RICARDO BELTRAN, Appellant

### V.

## THE STATE OF TEXAS, Appellee

### On Appeal from the 194th Judicial District Court
### Dallas County, Texas
### Trial Court Cause No. F-1056077-M

## MEMORANDUM OPINION ON REMAND

Before Justices Lang, Brown, and Stoddart[1]
Opinion by Justice Lang

A jury convicted Ricardo Beltran of the murder of Sheldon McKnight and assessed punishment at seventy years' confinement. On original submission, we affirmed the trial court's judgment, rejecting Beltran's claim that the trial court erred in denying his request, during the punishment phase of trial, for an instruction on sudden passion. *See Beltran v. State*, No. 05-12-01647-CR, 2014 WL 3587367 (Tex. App.—Dallas July 22, 2014), *reversed*, 472 S.W.3d 283 (Tex. Crim. App. 2015).

---

[1] The Honorable Craig Stoddart succeeded the Honorable Jim Moseley, a member of the original panel. Justice Stoddart has reviewed the briefs and record before the Court.

On Beltran's petition for discretionary review, the Texas Court of Criminal Appeals held Beltran was entitled to the requested instruction, reversed our judgment, and remanded the case for a harm analysis. *See* 472 S.W.3d at 293-96. For the reasons that follow, we conclude Beltran was harmed by the trial court's refusal to instruct on sudden passion, reverse the trial court's judgment as to punishment, and remand for a new punishment hearing.

## I. FACTUAL AND PROCEDURAL CONTEXT

McKnight, a drug dealer, was found dead in his burning apartment just hours after he had been seen with Beltran and Beltran's friend, Victor Ramos. He had been stabbed seventy-one times in his upper body and leg and suffered blunt-force trauma to his head. His apartment had been ransacked and his car stolen. Many of his belongings were later found in the stolen car, which was involved in a one-car accident from which Beltran and Ramos were seen fleeing, and in Beltran's apartment.

Although convicted of murder, Beltran was tried for capital murder based on allegations he intentionally caused McKnight's death while in the course of committing or attempting to commit robbery. *See* TEX. PENAL CODE ANN. § 19.03(a)(2) (West Supp. 2015). The State argued at trial that Beltran and Ramos planned to rob McKnight for drugs or money and, in the course of the robbery, killed him. In support, the State presented the testimony of a friend of Beltran and Ramos. This witness testified Beltran and Ramos used drugs, Beltran had a history of breaking into cars, and Ramos, who also dealt drugs, was known to carry a knife. This witness "partied" with Beltran and Ramos immediately before Beltran and Ramos got together with McKnight the day McKnight was murdered. According to this witness, they "popped bars," "did cheese," and drank "Jack Daniels," all of which made them feel "peaceful" and "relaxed."[2] The witness and Beltran then left Ramos for a while "to hit licks." The witness explained they

---

[2] The witness testified that "bars" are "anti-depressants, like Xanax basically," and "cheese" is "like Tylenol P.M. mixed with heroin."

needed money and wanted to help Ramos "buy more drugs to sell." They broke into one car, but did not find anything "valuable."

The State also presented testimony from a witness who saw Beltran and Ramos take with them a flat-screen television from McKnight's car as they fled from the accident and a witness whose brother was asked by Beltran and Ramos after the accident if he wanted to buy the television. Although these two witnesses identified Beltran when he was arrested moments later near the scene of the accident, Beltran denied, during his custodial interrogation, "having any involvement with [McKnight's car,]" being with Ramos, and "carrying the TV." Beltran also denied he was involved in the murder and denied he had been in McKnight's apartment the day McKnight was murdered.

The recording of Beltran's custodial interrogation was admitted into evidence and played for the jury. It showed Beltran changing his story numerous times and, at times, drowsy and falling asleep.

The recording was followed by the lead detective's testimony that records of Beltran's and Ramos's cellular telephones showed Beltran texted Ramos hours before the murder asking about borrowing his knife and "doing some robberies or hitting some licks." The detective testified other evidence further linked Beltran to the murder and robbery. The detective noted, as one example, that blood on a ring found next to the driver's side of McKnight's car following the accident "was linked back to . . . McKnight." This suggested "the driver of the vehicle was present when . . . McKnight was robbed and murdered." The detective also noted other persons, including Ramos, stated to him that Beltran "was involved and did in fact commit this murder."

Beltran, the sole witness to McKnight's death to testify, argued the killing was in self-defense and the robbery was staged. He recounted he and Ramos went to McKnight's two-story apartment for drugs and to "chill." Beltran sat on a couch while Ramos "fixed up lines" of

cheese heroin for Beltran and himself. At some point, McKnight sat next to Beltran, stroked his face and told him he was a "pretty little thing." Beltran stood up, wanting to leave, but Ramos told him McKnight was "cool" and they should keep "chill[ing]."

A short time later, McKnight told Beltran and Ramos he was expecting company, and if they wanted to keep "chill[ing]," they would need to go upstairs. Beltran and Ramos went upstairs to a bedroom and "finished" two or three more "lines" of heroin. Ramos then went downstairs, and Beltran laid down and "passed out."

Beltran testified he was awakened by McKnight sexually assaulting him.[3] Beltran screamed in panic and moved, but McKnight jumped on him and pushed his face into a pillow. Ramos, hearing Beltran's screams, came into the room and hit McKnight, causing McKnight to fall on Beltran. Beltran described feeling "real light headed" and having "blurred vision." He tried to get up, and Ramos "tr[ied] to pull him from underneath." McKnight grabbed Ramos, and Beltran grabbed McKnight from behind. Beltran told Ramos "to get some help." However, rather than getting help, Ramos began stabbing McKnight. McKnight began "flailing" and trying to "get . . . loose . . . trying to go toward [Ramos]," but Beltran held McKnight tight to protect Ramos and himself. Beltran told Ramos again to "[g]et some help." Ramos, though, continued stabbing McKnight, and Beltran closed his eyes "for a while." McKnight continued to struggle, and, at some point, Beltran let go of him. Beltran testified McKnight was "getting stabbed everywhere" and "kept moving his hands." The stabbing continued and "before [Beltran] knew it, [McKnight] was . . . dead." Beltran, who was "totally naked" and covered in blood, "started crying and . . . cleaning [him]self up." Because his shirt and shoes had blood on them, he took a pair of McKnight's shoes and one of McKnight's shirts. Beltran testified he was "totally shocked," "freaking out," and "scared." He asked Ramos if they should call the police,

---

[3] Evidence at trial revealed McKnight's DNA was found on Beltran's boxer shorts.

but Ramos said "no." The two left, but quickly returned when Beltran realized he had left his shirt and shoes in the apartment.

Beltran testified that while they were getting his belongings, Ramos suggested they "make it seem like a robbery." "Scared" and "just wanting to go home," Beltran did not "want to argue with Ramos" and "started grabbing things." He put on a "long leather jacket and . . . a straw hat [as a] disguise" and loaded McKnight's car. Meanwhile Ramos, "tr[ied] to . . . clean everything up." He joined Beltran in the car moments later, and the two left for Beltran's apartment. Beltran testified he was "freaking out . . . crying [and] scared." When he got home, he took a shower and got a plate for Ramos, who "still had some bars." The two "crushed [the bars] down" and snorted them before leaving for the location where they planned on disposing of McKnight's property. On the way there, Beltran, who was driving, "doz[ed] off" and crashed into a pole.

Asked if his intentions when he went to McKnight's apartment were to rob and kill McKnight, Beltran denied they were and denied he killed or stabbed McKnight. Beltran also denied knowing where Ramos got the knife with which he stabbed McKnight and denied he intended to help Ramos kill McKnight. Asked about the fire, Beltran testified he learned of the fire "later," but was "sure" Ramos set it.

The court's charge to the jury authorized the jury to convict Beltran as a principal or as a party and, in relevant part, instructed the jury as follows:

> Under the law of self-defense, you are instructed that a person is justified in using force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself against the other person's committing or attempting to commit sexual assault.
>
> The use of force against another is not justified in response to verbal provocation alone.
> -
> A person is justified in using deadly force against another if he would be justified in using force against the other person as above stated and when and to

–5–

the degree he reasonably believes that deadly force is immediately necessary to protect himself against the other person's imminent commission of sexual assault.

The term "deadly force" as used herein means force that is intended or known by the defendant to cause, or in the manner of its use or intended use, is capable of causing death or serious bodily injury.

The term "reasonable belief" as used herein means a belief that would be held by an ordinary and prudent person in the same circumstances as the defendant. When a person is attacked with unlawful deadly force, or he reasonably believes he is under attack or attempted attack with unlawful deadly force, and there is created in the mind of such person a reasonable expectation or fear of death or serious bodily injury, then the law excuses or justifies such person in resorting to deadly force by any means at his command to the degree that he reasonably believes to be immediately necessary, viewed from his standpoint at the time, to protect himself from such attack or attempted attack.

It is not necessary that there be an actual attack or attempted attack, as a person has a right to defend his life and person from apparent danger as fully and to the same extent as he would had the danger been real, provided that he acted upon a reasonable apprehension of danger, as it appeared to him from his standpoint at the time, and that he reasonably believed such force was immediately necessary to protect himself against the other person's use or attempted use of unlawful deadly force.

*See* TEX. PENAL CODE ANN. §§ 7.01(a), 7.02(b), 9.01, 9.31, 9.32 (West 2011). The jury rejected Beltran's self-defense claim and returned a general verdict of guilty.

At punishment, Beltran offered testimony from his family showing he grew up in a "pretty rough" neighborhood, and his nine-member family lived in a one-bedroom house. His parents divorced when he was thirteen and, he began using drugs while in middle school.[4] Beltran also testified, stating he had just turned eighteen at the time of the murder and had a one-year old daughter who was born after he was arrested. He did not recount the circumstances surrounding McKnight's death, but affirmed his testimony during the guilt/innocence stage of trial concerning McKnight's death was true, and he did not intend to kill McKnight.

---

[4] Testimony showed that, while in middle school, he was placed on probation for "possession of a controlled substance, more than one gram, in a drug-free zone."

The charge, while not containing a sudden passion instruction, instructed the jury it could "take into consideration all the facts shown by the evidence admitted . . . in the full trial of this case and the law as submitted . . . in this Charge and the Charge [given at guilt-innocence] by the Court." The State's closing sought a life sentence or at least "one year for every wound inflicted upon" McKnight. Urging the jury "to take into account all the facts and all circumstances" including that McKnight's murder was not the "worst murder" and "was not premeditated," Beltran asked for a "verdict based on justice and a verdict based on mercy."

In concluding the trial court erred in denying Beltran's request for a sudden passion instruction, the Court of Criminal Appeals found the jury "could arguably have deduced" the sexual assault and Beltran's reaction to the assault "triggered a chain reaction" resulting in McKnight's death:

> Beltran . . . scream[ed] in panic; McKnight pushed Beltran's face into the pillow to stop his screaming; Ramos presumably heard the screaming, entered the room purportedly to help Beltran, and hit McKnight in the head; McKnight then turned on Ramos, which prompted Beltran to grab McKnight and hold onto him; then Ramos suddenly started stabbing McKnight, and Beltran was in too much of a daze to have been capable of reflecting on what he was doing.

*Beltran*, 472 S.W.3d at 295.[5]

## II. SUDDEN PASSION

In a supplemental brief filed upon remand, Beltran argues that his acquittal of capital murder and conviction on the lesser-included murder charge "demonstrate that, in all likelihood,

---

[5] As stated above, Beltran testified Ramos did the stabbing. Accordingly, the law of parties applied to Beltran at guilt-innocence. In consideration of those points, the court of criminal appeals identified as an issue of first impression whether the law of parties applies at punishment to the issue of sudden passion. *Beltran*, 472 S.W.3d at 290-91. The court considered the early line of capital murder death penalty cases where the court determined the law of parties did not apply at the punishment phase of trial. *Id.* at 291-92. Then, the court concluded "the derivative aspect of the law of parties (criminal responsibility *for the conduct of another*) does not factor into whether a defendant is entitled to an instruction on sudden passion." *Id.* at 293. The court further concluded, because sudden passion is a mitigating factor in determining a defendant's punishment, it is the defendant's conduct by which "'he act[s] with intent to promote or assist the commission of the offense,' and by which 'he encourages, aids, or attempts to aid the other person to commit the offense'" that determines whether a sudden passion instruction should be given. *Id.* at 293. Therefore, the court analyzed only Beltran's conduct to determine whether the trial court erred in failing to instruct the jury on sudden passion. *Id.* In so doing, the court considered whether Beltran presented evidence that (1) he acted under the immediate influence of terror, anger, rage, or resentment; (2) his sudden passion was induced by some provocation by McKnight, and that such provocation would commonly produce such passion in a person of ordinary temper; (3) he committed the murder before regaining his capacity for cool reflection; and (4) a causal connection existed among McKnight's provocation, Beltran's passion, and the murder. *Id.* at 293-95.

the jury believed he acted out of sudden passion," and therefore, he was harmed by the lack of a sudden passion instruction. Beltran also responds to the State's argument in its brief on original submission that any error in failing to instruct the jury on sudden passion was not harmful because the jury, having rejected Beltran's self-defense claim, would have also rejected his sudden passion claim. Relying on *Trevino v. State*, 100 S.W.3d 232 (Tex. Crim. App. 2003), Beltran asserts the jurors could have rejected his self-defense claim because they believed he could have retreated after being awakened by McKnight assaulting him or because force or deadly force was not reasonably necessary, and yet found he killed McKnight while under the influence of sudden passion.

The State counters that, "[h]ad the jurors believed any material part of [Beltran's] account of the killing their belief would have manifested itself in one or two ways: an acquittal, or, a sentence of much less than seventy years." The State observes the jury was permitted to consider every fact admitted at trial. While this included Beltran's account that McKnight sexually assaulted him, he became addicted to drugs at a young age, and had a one-year old daughter, the State notes it also included testimony inconsistent with his claim that he acted under the immediate influence of sudden passion. Specifically, the State notes that before the murder, Beltran "was high and relaxed" even after McKnight remarked he was a "pretty little thing" and stroked his face. This evidence, the State argues, shows Beltran "felt no fear or ill-will toward McKnight" at that point. The State further notes that within minutes of the killing, Beltran participated in Ramos's plan to rob McKnight, stealing the ring "from McKnight's dead body" and other items "either [to] stage the crime scene or profit by theft." This evidence, the State argues, shows "a coherent thought process . . . inconsistent with having recently been incapable of cool reflection." Finally, the State notes Beltran did not disclose he had been assaulted during his custodial interrogation, was "deceitful," and, at times, "yawned and dozed."

–8–

The State argues this evidence is inconsistent with "recently having been sexually assaulted or otherwise traumatized." Relying on *Wooten v. State*, 400 S.W.3d 601 (Tex. Crim. App. 2013), the State asserts the jury would not have found in favor of Beltran if instructed on sudden passion.[6]

### A. Applicable Law

Sudden passion is a mitigating circumstance that, if proven by a preponderance of the evidence, reduces murder from a first degree felony, which carries a maximum punishment of life imprisonment, to a second degree felony, which carries a maximum punishment of twenty years' imprisonment. *See* TEX. PENAL CODE ANN. §§ 12.32, 12.33, 19.02(d); *McKinney v. State*, 179 S.W.3d 565, 569 (Tex. Crim. App. 2005). The penal code defines "sudden passion" as "passion directly caused by and arising out of provocation by the individual killed . . . which passion arises at the time of the offense and is not solely the result of former provocation." TEX. PENAL CODE ANN. § 19.02(a)(2). "Adequate cause" is defined as "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.* § 19.02(a)(1). Rarely, when self-defense is raised will sudden passion not be raised. *See Chavez v. State*, 6 S.W.3d 56, 65 (Tex. App.—San Antonio 1999, pet. ref'd). Conversely, "when the State's evidence is sufficient to overcome a claim of self-defense, it will also be sufficient to show the absence of sudden passion." *Id.* (quoting *Benavides v. State*, 992 S.W.2d 511, 524-25) (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd).

---

[6] The State also argues Beltran's "sudden passion claim is really a vicarious-sudden-passion-by-proxy claim" since Ramos stabbed McKnight. Yet, the State argues nothing in the record reflects Ramos was aware Beltran was assaulted, and without that awareness, Beltran's sudden passion claim fails. However, at issue is Beltran's state of mind, not Ramos's. Moreover, contrary to the State's contention, the record reflects Beltran screamed in panic when he awoke and was "totally naked." The record further reflects Beltran wanted to leave after McKnight called him a "pretty little thing" and stroked his face. From this, Ramos could have inferred that McKnight assaulted Beltran.

*B. Standard of Review*

Article 36.19 of the Texas Code of Criminal Procedure sets forth the standard for appellate review of charge error. *See* TEX. CODE CRIM. PROC. art. 36.19 (West 2006); *Trevino v. State*, 100 S.W.3d at 242. When, as here, a defendant properly requests an instruction and the instruction is not given, the applicable standard is whether the error "was calculated to injure the [defendant's] rights," that is, whether the defendant suffered "some harm." *Trevino*, 100 S.W.3d. at 242.

A defendant does not suffer harm from the failure alone to receive the requested instruction. *Id.* at 242. Rather, harm must be evaluated in light of the record as a whole, including the entirety of the evidence, the complete jury charge, counsel's arguments, and any other relevant factors revealed by the record. *Wooten*, 400 S.W.3d at 606. In conducting its analysis, the reviewing court focuses on the likelihood the jury would have believed the defendant acted out of sudden passion had it been given the instruction. *Id.*

*C. Application of Law to Facts*

In *Trevino* and *Wooten*, upon which the parties rely, the Court of Criminal Appeals addressed the question of how a jury's rejection of self-defense affects the harm analysis with respect to the erroneous denial of a sudden passion instruction. *See Wooten*, 400 S.W.3d at 608; *Trevino*, 100 S.W.3d at 241. In *Trevino*, appellant was charged with the murder of his wife. 100 S.W.3d at 232, 236. Appellant claimed the shooting occurred after a heated argument and struggle over two guns. *Id.* at 233. According to the lead detective, appellant told him his wife confronted him with a gun after finding telephone numbers of other women in his wallet. *Id.* Appellant retrieved his gun, and after his wife shot at him but missed, the two struggled over the guns. *Id.* In the course of the struggle, appellant's wife was shot three times. *Id.*

The detective testified the crime scene did not match appellant's story. *Id.* Based on this testimony, the State argued appellant shot his wife and then staged the scene to make it look like self-defense. *Id.* at 232, 235-36. The jury rejected appellant's claim the shooting was an accident and he acted in self-defense and, after the trial court refused to instruct the jury on sudden passion, assessed a sixty-year sentence. *Id.* at 236.

The court of appeals reversed, finding the trial court should have instructed the jury on sudden passion, and appellant was harmed. *Id.* Agreeing with the court of appeals that appellant was harmed, the court of criminal appeals noted the jury could have found appellant killed his wife in sudden passion and then staged the crime scene to make the killing appear to have occurred in self-defense. *Id.* at 241-43.

In *Wooten*, appellant was charged with murder after the victim was killed in a gunfight. 400 .S.W.3d at 602-03. According to the appellant, who testified at trial, the victim dropped off appellant's girlfriend, a prostitute, at appellant's apartment after "backing out" of a "date" with her. *Id.* at 603. Appellant greeted his girlfriend outside the apartment and approached the victim's car. *Id.* Appellant noted the victim had placed a gun on the console, but began talking with him. *Id.* When the conversation turned to why the "date" had not occurred, the victim's demeanor "became more combative." *Id.* Appellant testified the victim was frustrated and began to speak in a "heightened tone" and display a "sort of 'aggressiveness' in his speaking." *Id.* When appellant told the victim he should pay his girlfriend "something for her time," the victim lashed out verbally and then shot at appellant. *Id.* Appellant shot back in self-defense, killing the victim. *Id.*

The jury was instructed on self-defense, but told "not to consider whether appellant failed to retreat." *Id.* at 603-04, 609. The jury rejected appellant's self-defense claim, and as in *Trevino*, when the trial court refused to instruct on sudden passion, assessed a sixty-year

sentence. *Id.* at 603-04. The court of appeals, concluding the failure to instruct on sudden passion harmed appellant, reversed as to punishment. *Id.* at 604.

Disagreeing appellant was harmed, the court of criminal appeals observed "the success of appellant's self-defense claim boiled down to whether the jury would accept that, when he shot [the victim], he reasonably believed that deadly force was necessary to protect himself from [the victim's] use of deadly force." *Id.* at 607, 609. Noting deadly force was the only element of self-defense refuted by the evidence, the court concluded the jury rejected the inference the victim shot first because, had they believed appellant's testimony the victim shot first, the jury "almost certainly" would have acquitted appellant. *Id.* The court further concluded that, the jury, having rejected appellant's self-defense claim, "was highly unlikely" to find appellant acted under sudden passion. *Id.*

Viewing the record as a whole, we conclude this case is more similar to *Trevino*, and a likelihood exists the jury would have believed Beltran acted out of sudden passion had it been given the instruction. As Beltran argues, the jury could have rejected his self-defense claim because it believed he could have retreated after being awakened by the assault or because it determined force or deadly force was not reasonably necessary, and yet determined he killed McKnight after being provoked by the assault. Although the State points to significant evidence showing Beltran's state of mind before and after the murder, neither negates sudden passion. The critical period is when the killing occurred. *See* TEX. PENAL CODE ANN. § 19.02(a)(2). That Beltran was "high and relaxed" before the murder may show the murder was not premeditated, but it does not preclude a jury from deducing that the sexual assault "triggered a chain reaction that resulted in McKnight's death." *Beltran*, 472 S.W.3d at 295. Further, that Beltran displayed a consciousness of guilt after the murder, as demonstrated by his staging a robbery and lying during his custodial interrogation, may establish he committed the offense, but it does not,

–12–

without more, preclude a finding, at punishment–after his intent to kill has been determined, that he committed the offense while under the immediate influence of passion arising out of McKnight's provocation. Finally, while Beltran may have acted inconsistent with "recently having been sexually assaulted or otherwise traumatized" during his custodial interrogation, some physical evidence supported Beltran's testimony that he was assaulted.

In concluding a likelihood exists the jury could have found Beltran acted under the influence of sudden passion, we have also considered the jury charge as a whole, counsel's arguments, and the rest of the record. Although the charge did include an instruction that the jury "could take into consideration all the facts shown by the evidence admitted . . . in the full trial . . . and the law as submitted . . . in this Charge and the Charge" given at guilt-innocence, that instruction did not ameliorate the omission of the sudden passion instruction which would have capped punishment at twenty year's confinement. Further, although defense counsel argued the case was not one "involv[ing] a life sentence" and asked for mercy, he was unable to address the merits of sudden passion. Finally, no other significant mitigating factor exists in the record, magnifying the potential effect the lack of the requested instruction had on the jury's assessment of punishment.

We sustain Beltran's sole issue based on the record before us.

### III. CONCLUSION

We reverse the trial court's judgment as to punishment and remand for a new punishment hearing.

Do Not Publish
Tex. R. App. P. 47
121647RF.U05

/Douglas S. Lang/
DOUGLAS S. LANG
JUSTICE

–13–



## Court of Appeals
## Fifth District of Texas at Dallas

### JUDGMENT

RICARDO BELTRAN, Appellant

No. 05-12-01647-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the 194th Judicial District Court, Dallas County, Texas
Trial Court Cause No. F-1056077-M.
Opinion delivered by Justice Lang. Justices Brown and Stoddart participating.

Based on the Court's opinion of this date, we **REVERSE** the trial court's judgment as to punishment and **REMAND** for a new punishment hearing pursuant to TEX. CODE CRIM. PROC. ANN. Art. 44.29(b).

Judgment entered this 7th day of July, 2016.