**Opinion issued December 29, 2020**



In The

# Court of Appeals

### For The

## First District of Texas

_____

### NO. 01-19-00156-CR

_____

**ANGEL LEE RANKIN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

_____

**On Appeal from the 209th District Court**
**Harris County, Texas**
**Trial Court Case No. 1325037**

_____

### DISSENTING OPINION

I respectfully dissent. This is a classic case of sudden passion, as appellant,

Angel Lee Rankin, argues in her third issue. I would hold that Rankin proved her

affirmative defense of sudden passion by a preponderance of the evidence, that a

finding otherwise is against the great weight and preponderance of the evidence, and that, therefore, her offense should have been reduced to a second-degree felony. I would reverse and remand the case for a new punishment hearing.

## Sudden Passion

### A.    Standard of Review

A person commits murder if she intentionally or knowingly causes the death of an individual or intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. *See* TEX. PENAL CODE ANN. § 19.02(b)(1)–(2). Typically, murder is a first-degree felony. *Id.* § 19.02(c). The Texas Penal Code provides, however, that

> [a]t the punishment stage of a [murder] trial, the defendant may raise the issue as to whether [s]he caused the death under the immediate influence of sudden passion arising from an adequate cause. If the defendant proves the issue in the affirmative by a preponderance of the evidence, the offense is a felony of the second degree.

*Id.* § 19.02(d); *Beltran v. State*, 472 S.W.3d 283, 289 (Tex. Crim. App. 2015). "'Sudden passion' means passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." TEX. PENAL CODE ANN. § 19.02(a)(2); *Beltran*, 472 S.W.3d at 289. "'Adequate cause' means cause that would commonly produce a degree of anger, rage, resentment, or

2

terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." TEX. PENAL CODE ANN. § 19.02(a)(1); *Beltran*, 472 S.W.3d at 289.

### 1. Initial inquiry: propriety of submission of sudden passion issue to the jury

The standard of review of sudden passion, in my view, must begin with an initial threshold inquiry to determine whether the submission of a jury instruction on sudden passion is supported by the record. This is important because it is in this context that the Court of Criminal Appeals has set out the statutory elements a defendant must prove to be entitled to the defense. If the issue of sudden passion is properly submitted, the jury's finding on the issue is adverse to sudden passion, and, as here, the defendant complains on appeal that she proved the affirmative defense of sudden passion, the reviewing court must then review the evidence to determine whether legally or factually sufficient evidence exists to support the adverse finding on sudden passion. If the adverse finding on sudden passion is not supported by legally or factually sufficient evidence, then the charge against the defendant must be reduced to a second-degree felony.

To justify the submission of a jury instruction on sudden passion at the punishment phase,

> the record must at least minimally support an inference: 1) that the defendant in fact acted under the immediate influence of a passion such as terror, anger, rage, or resentment; 2) that [her] sudden passion was in fact induced by some provocation by the deceased or another acting with him, which provocation would commonly produce such a passion

3

in a person of ordinary temper; 3) that [s]he committed the murder before regaining [her] capacity for cool reflection; and 4) that a causal connection existed "between the provocation, passion, and homicide."

*Beltran*, 472 S.W.3d at 289–90 (quoting *Wooten v. State*, 400 S.W.3d 601, 605 (Tex. Crim. App. 2013)); *see* TEX. PENAL CODE ANN. § 19.02(a), (d). The evidence supporting submission of a jury instruction on the sudden passion defense will satisfy the defendant's burden of production even if it is "weak, impeached, contradicted, or unbelievable," and it may arise from any source, during either phase of trial. *Beltran*, 472 S.W.3d at 290. The defendant's testimony alone is sufficient to raise the issue and require an instruction in the charge. *Id.*

In considering whether the defendant was entitled to a sudden passion charge, "[a]n appellate court's duty is to look at the evidence supporting the charge of sudden passion, not the evidence refuting it." *Id.* at 294; *see id*. at 293–95 (holding that evidence supported defendant's requested jury instruction on sudden passion where there was evidence that (1) defendant acted under immediate influence of terror, testifying that he "panicked" and was "screaming in panic" when he awoke to find complainant behind him licking his anus, thus (2) providing evidence of provocation by complainant that (3) could have rendered defendant incapable of cool reflection before acting, where (4) jury could arguably have deduced, from defendant's testimony, that complainant's sexual assault triggered chain reaction that resulted in defendant's crying and panicked screaming and, ultimately, in complainant's

4

stabbing death); *see also Trevino v. State*, 100 S.W.3d 232, 234–35, 239–41 (Tex. Crim. App. 2003) (holding that defendant was entitled to jury charge on sudden passion where detective testified that defendant informed him (1) he had altercation with complainant over phone numbers of other women she found in his wallet; (2) she confronted defendant with gun and pulled trigger; (3) defendant retrieved his own gun, and complainant was shot during struggle for guns; (4) defendant's sister testified that when defendant called her after shooting occurred he "was freaking out" and, when she arrived, she found defendant "crying and shaking"; and (5) another detective testified that when he entered defendant's home, defendant was kneeling over complainant and said, "you gotta help her").

The question whether the defendant accidentally killed the victim or killed the victim in self-defense does not preclude a jury charge on sudden passion at the punishment phase of trial where both accident and self-defense are asserted by the defendant and rejected by the jury at the guilt/innocence phase if these defenses are supported by some evidence. *Trevino*, 100 S.W.3d at 239–40; *see Beltran*, 472 S.W.3d at 290 (stating that "sudden passion and self-defense are not mutually exclusive" and that jury's rejection of self-defense theory at guilt-innocence phase does not preclude submission of sudden passion issue at punishment phase).

When considering whether there is "some" evidence of sudden passion presented at trial to justify a sudden passion charge, it is error to look solely to the

5

evidence against sudden passion. *Trevino*, 100 S.W.3d at 238–39. Rather, "an appellate court's duty is to look at the evidence supporting that charge, not [at] the evidence refuting it." *Id.* The defendant is entitled to the charge so long as some evidence supports it, "regardless of whether it conflicted with other evidence, including some evidence of an accidental shooting," or, as here, an accidental stabbing. *See id.* at 240. It is also error for a court of appeals to hold that no charge of sudden passion should be given because a defendant has denied at trial the specific intent to kill. *Id.* at 236–37, 240 (noting that earlier cases holding that denial of intent to kill precluded charge on sudden passion were decided on basis of prior law before Legislature eliminated offense of voluntary manslaughter for defendant acting "under the immediate influence of sudden passion arising from an adequate cause" and replaced it with punishment issue in murder statute).

Once it is ascertained that the charge of sudden passion was properly submitted to the jury, the appellate court's task turns to determining whether the evidence is legally or factually sufficient to support reducing the charge from the first-degree felony of murder to a second-degree felony due to sudden passion.

### 2. *Legal sufficiency of evidence of sudden passion*

As sudden passion is an affirmative defense, Rankin, as defendant, had the burden of proof and the burden of persuasion by proving her defense by a preponderance of the evidence. *See* TEX. PENAL CODE ANN. § 2.04(d); *Meraz v.*

6

*State*, 785 S.W.2d 146, 150 (Tex. Crim. App. 1990). This is the same standard of proof as that employed in civil cases. *Matlock v. State*, 392 S.W.3d 662, 667 (Tex. Crim. App. 2013). Thus,

> [w]hen an appellant asserts that there is no evidence to support an adverse finding on which she had the burden of proof [by a preponderance of the evidence, such as the sudden passion affirmative defense], we construe the issue as an assertion that the contrary was established as a matter of law. We first search the record for evidence favorable to the [adverse] finding, disregarding all contrary evidence *unless a reasonable factfinder could not*. If we find no evidence supporting the finding, we then determine whether the contrary was established as a matter of law.

*Id.* at 669. As the Court of Criminal Appeals has explained,

> [t]he final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. Whether a reviewing court begins by considering all the evidence or only the evidence supporting the verdict, legal-sufficiency review in the proper light must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not.

*Id.* at 669 n.19 (quoting *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)).

In reviewing the legal sufficiency of the evidence to support an adverse finding on the affirmative defense of sudden passion, the appellate court first looks for more than a mere scintilla of evidence that supports the jury's implied finding adverse to the affirmative defense and disregards all evidence supporting the defense unless a reasonable factfinder could not disregard that evidence. *See id.* at 669; *Moncivais v. State*, 425 S.W.3d 403, 407 (Tex. App.—Houston [1st Dist.] 2011, pet.

7

ref'd); *Smith v. State*, 355 S.W.3d 138, 148 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). If the record contains no evidence supporting the adverse finding on the affirmative defense, then the court examines the record to determine whether the defendant established the affirmative defense as a matter of law. *Matlock*, 392 S.W.3d at 669–70; *Moncivais*, 425 S.W.3d at 407–08; *Smith*, 355 S.W.3d at 148. The reviewing court may conclude that the evidence is legally insufficient to support the jury's rejection of the defendant's affirmative defense only if the defendant conclusively proves his affirmative defense such that "no reasonable jury [would be] free to think otherwise." *Matlock*, 392 S.W.3d at 670 (quoting *Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009)).

### 3. *Factual sufficiency of evidence of sudden passion*

Should the reviewing court determine that the affirmative defense of sudden passion is not established by the evidence as a matter of law, it may look to the factual sufficiency of the evidence to support the jury's adverse finding on the affirmative defense. In a factual-sufficiency review, the appellate court "views the entirety of the evidence in a neutral light, but it may not usurp the function of the jury by substituting its judgment in place of the jury's assessment of the weight and credibility of the witnesses' testimony." *Id.* at 671. When reversing on factual insufficiency grounds, the appellate court must set out the relevant evidence and explain "precisely how the contrary evidence greatly outweighs the evidence

8

supporting the verdict," and it must clearly state "why the verdict is so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased." *Id.* If the reviewing court so finds, it may reverse the trial court's judgment and remand the case for a new trial. *Id.* at 672.

The "seminal case" on the standard of review of factual sufficiency challenges to findings on affirmative defenses is *Meraz v. State*. *See Matlock*, 392 S.W.3d at 670–71. In *Meraz*, the Court of Criminal Appeals stated,

> [W]hen the courts of appeals are called upon to exercise their fact jurisdiction, that is, examine whether the appellant proved [her] affirmative defense or other fact issue where the law has designated that the defendant has the burden of proof by a preponderance of evidence, the correct standard of review is whether after considering all the evidence relevant to the issue at hand, the judgment is so against the great weight and preponderance of the evidence so as to be manifestly unjust.

785 S.W.2d. at 154–55 (overruling prior law). In establishing this standard, the court also made it clear that when an appellate court examines all the evidence concerning an affirmative defense and "then seeks to determine if any rational trier of fact could have found that the defendant failed to prove [her] defense by a preponderance of the evidence, it is using the same mental processes as it would have used had it utilized against the great weight and preponderance" of the evidence. *Id.* at 154. "The 'weight of the evidence' refers to 'a determination [by] the trier of fact that a greater amount of credible evidence supports one side of an issue or cause than the other.'" *Id.* at 156 (quoting *Tibbs v. Florida*, 457 U.S. 31, 37–38 (1982)). Thus, by exercising

its fact jurisdiction to decide whether a defendant has borne her burden of proof on an affirmative defense, such as sudden passion, the court of appeals does not usurp the function of the jury. *See id.* at 154; *Smith*, 355 S.W.3d at 148 ("In the factual sufficiency review of the evidence, we review all of the evidence neutrally, but we do not intrude on the factfinder's role as the sole judge of the weight and credibility given to any witness's testimony.").

Unlike a finding of legal insufficiency of the evidence, an appellate court's determination that the jury's finding on sudden passion is "against the great weight and preponderance of the evidence" does not necessitate an acquittal. *See Meraz*, 785 S.W.2d at 156 ("[A]n appellate court's disagreement with the jurors' weighing of the evidence does not require the special deference accorded verdicts of acquittal.") (quoting *Tibbs*, 457 U.S. at 42). And that determination "does not prohibit a retrial if a conviction is reversed on the basis that the jury's rejection of a defendant's [affirmative defense] is against the great weight and preponderance of the evidence." *Id.* Thus, the responsibility of this Court in determining whether the jury's negative finding on sudden passion in the instant case is against the great weight and preponderance of the evidence is a heavy one.

**B. Application of the Law to the Facts of the Case**

### 1. *Evidence supporting charge of sudden passion*

Following the lead of the Court of Criminal Appeals, I would first determine whether some evidence from any source, even if weak or contradicted, supported the instruction on sudden passion submitted to the jury under the four-part test set out in *Beltran*, specifically, whether (1) Rankin "in fact acted under the immediate influence of a passion such as terror, anger, rage, or resentment"; (2) her sudden passion was in fact induced by some provocation by Willis, the complainant, and was the type of "provocation [that] would commonly produce such a passion in a person of ordinary temper"; (3) she committed the murder before regaining her capacity for cool reflection; and (4) "a causal connection existed 'between the provocation, passion, and homicide.'" *See Beltran*, 472 S.W.3d at 289–90.

Here, the evidence at trial showed that the battery in Rankin's car died just after she left home to go to the store to buy some snacks. She called her 13-year-old daughter, M.R., to tell her the car had broken down; and she called her boyfriend, Steven Willis, who was driving her other car, to come help her jump-start the car. She called Willis repeatedly, with no response. Rankin testified that when he finally arrived, he "had an attitude" and acted as though Rankin was "bothering him to come help [her]." Willis pushed her car into the parking lot of a washeteria and retrieved the jumper cables from the trunk while Rankin retrieved a paring knife she had kept

11

in the car since an earlier accident to unlatch the damaged hood. Rankin kept asking Willis where he had been and why he hadn't answered her calls, and he told her, "Shut the fuck up." She finally told him she did not want his help, that she would figure it out, but that he could not take her other car.

After Rankin and Willis began arguing, M.R., who had come outside to check on her mother, testified that she saw Willis grab and lunge at her mother. M.R. then left to retrieve a bat from their apartment. Rankin testified that Willis exclaimed, "Bitch, I'll kill you!" She stated that Willis grabbed her "right wrist with his left hand," "squeezed it," and began to "choke" her, and she stated that he choked her for "at least 30 seconds." Rankin started to "lose [her] breath" and felt like she "was about to die," so she pleaded with Willis to release her neck. Rankin, who still had the paring knife in her hand from attempting to open the hood of her car, testified that she struggled to pry her wrist from Willis's hand. When she managed to break free, she "called out for help from God," "took the knife," and "poked him once to get him off of" her. She stated, "I was terrified, I was scared, I was horrified."

I would find this testimony to provide some evidence that Rankin "in fact acted under the immediate influence of a passion such as terror, anger, rage, or resentment" arising out of her anger and frustration with Willis and with the situation. *See id.* at 290. I would also find these facts to be some evidence that sudden passion was in fact induced in Rankin by some provocation by Willis, whether by

12

his words or by his actions, and was the type of "provocation [that] would commonly produce such a passion in a person of ordinary temper." *See id.* And I would find these facts to be some evidence that Rankin committed the murder before regaining her capacity for cool reflection. *See id.*

Finally, describing what happened after she "poked" Willis with the knife, Rankin testified:

> He lets go of me, he walks away, he gets back into the Cutlass [the car Willis had driven to the scene], he starts the Cutlass, he reverses the Cutlass, he backs out of the position the car was in, to drive off.
>
> . . . .
>
> When he gets to the intersection to exit the parking lot, he doesn't turn. The car stops. He puts the car in park, he gets out of the car, he walks a little bit behind the car, and he drops.

Rankin testified that as Willis walked away from her car, she sat in her car and cried with the door open. She noticed Willis fall to the ground, and she ran over to help him, but he was unconscious and unresponsive. Rankin put Willis in the passenger seat of the Cutlass and called 911. While she was speaking to the 911 operator, Rankin decided that she could get to the hospital quicker than an ambulance. She "took off," "doing 95 [mph] down Fondren the whole way." M.R. returned from the apartment with the bat and saw Rankin's car there, but the Cutlass, Rankin, and Willis were gone. However, several drops of blood were subsequently

found on the ground in the area where Rankin testified she picked Willis up and got him back into the car to drive to the hospital.

Taking this evidence as true for purposes of submitting the issue of sudden passion to the jury, I would find this to be some evidence that "a causal connection existed 'between the provocation, passion, and homicide,'" as opposed to a murder committed in cool reflection without circumstances causing passionate anger and frustration and without immediate provocation. *See id.*

In sum, I would find that Rankin submitted "some evidence" to support each of the elements of her sudden passion affirmative defense without considering its source or strength, thereby justifying the submission of the issue to the jury. Thus, I would turn to whether the evidence was legally sufficient to support the jury's adverse finding on the sudden passion issue.

### 2.   *Legal sufficiency of evidence of sudden passion*

To determine whether the evidence was legally sufficient to support the jury's adverse finding on sudden passion, I would "first search the record for evidence favorable to the [adverse] finding, disregarding all contrary evidence *unless a reasonable factfinder could not*," and, if I found no evidence supporting the jury's adverse finding on sudden passion, I would then "determine whether the contrary was established as a matter of law." *See Matlock*, 392 S.W.3d at 669; *Moncivais*, 425 S.W.3d 407–08; *Smith*, 355 S.W.3d at 148.

14

Here, I agree with the majority that there was more than a scintilla of evidence to support the jury's adverse finding on sudden passion, but barely more, considering all four factors of sudden passion. Detective Hernandez, who questioned Rankin on the night Rankin stabbed Willis, testified that Rankin did not mention that Willis had choked her. Rankin herself testified that she did not tell Detective Hernandez because she was "afraid that once [Willis] got out of the hospital, if they were to arrest him, he was going to come hurt [her]." Instead, she told Officer R. Lujan that she realized later that the knife in her right hand had "accidentally" penetrated Willis's chest when he had bent over her. She changed her story at trial, however, and testified that she "poked" Willis to get him off of her. Also Lujan, who interviewed Rankin that night, testified that she did not tell him that Willis had tried to choke or otherwise hurt her, and she did not appear injured. He did not see any marks indicating she had been choked. Therefore, I conclude that more than a scintilla of evidence supported the jury's adverse finding on sudden passion— namely the officers' testimony and Rankin's changed story—so that the evidence was legally sufficient to support the jury's rejection of sudden passion. *See Matlock*, 392 S.W.3d at 669.

I would turn, therefore, to whether the evidence was factually sufficient to support the jury's adverse finding on sudden passion or whether that finding was against the great weight and preponderance of the evidence presented at trial.

15

### 3. *Factual sufficiency of evidence of sudden passion*

Under *Meraz* and *Matlock*, factually insufficient evidence supports an adverse finding on an affirmative defense, such as sudden passion, if, when considering all of the evidence, the adverse finding was "so 'against the great weight and preponderance' of that evidence [as] to be manifestly unjust." *Matlock*, 392 S.W.3d at 671 (quoting *Meraz*, 785 S.W.2d at 154–55).

First, regardless of Rankin's testimony as to her state of mind and her intent, intent is typically inferred from the circumstances under which a culpable act is committed. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) ("Intent may also be inferred from circumstantial evidence such as acts, words, and the conduct of the appellant."). And, in this case, there can be no doubt that the jury disbelieved Rankin's claim that she did not intend to kill Willis at the moment she stabbed him in that it convicted her of murder, an intentional crime. *See* TEX. PENAL CODE ANN. § 19.02(b)(1)–(2) (setting out mens rea of murder). The inquiry therefore turns to whether her crime met the sudden passion criteria under the circumstances in which it occurred. *Cf. id.* § 19.02(d) (providing for affirmative defense of sudden passion at punishment stage of trial after defendant has been found guilty of murder at guilt-innocence stage).

The evidence in this case clearly satisfies all four criteria for submitting the issue of sudden passion to the jury: (1) the unrebutted evidence overwhelmingly

indicates that Rankin acted under the immediate influence of "terror, anger, rage, or resentment"; (2) the unrebutted evidence likewise shows that Willis provoked her anger and resentment by refusing to answer her calls, then, when he did arrive at the scene, refusing to tell her where he had been, acting "bothered" and unwilling to help her, and, by her and M.R.'s testimony, lunging at her and choking her, a "provocation [that] would commonly produce such a passion in a person of ordinary temper"; (3) she immediately committed the murder with the paring knife she held in her hand to open the hood as soon as she loosened Willis's grip on her neck and before she could have regained her capacity for cool reflection; and (4) clearly "a causal connection existed 'between the provocation, passion, and homicide.'" *See Beltran*, 472 S.W.3d at 289–90. So the question becomes how strong the evidence for and against sudden passion was in this case.

Rankin testified that she always kept a knife in her car to open its damaged hood because she often experienced electrical problems, and she had the knife in her hand to unlatch the hood as her altercation with Willis escalated. This fact argues strongly against a finding that Rankin planned to murder Willis and armed herself to do so. Instead, it is evidence that she was overtaken by sudden passion in that she used a paring knife she already had in her hand to "poke" Willis in the chest—not a weapon she had to fetch or had brought to the scene for the purpose of stabbing Willis. And that she was able to thrust that short knife into his chest before he could

17

ward off the blow indicates that he was very close to her when she stabbed him, as Rankin testified.

There was also evidence that Rankin was the victim of domestic violence at the hands of Willis, and photographs of Rankin's black eye and bruises from a previous altercation were admitted into evidence. This evidence, while insufficient in itself to support a finding of sudden passion, does support the inference that Rankin had reason to fear Willis and that Willis had a history of harming Rankin when angry. Rankin testified that, in this case, the argument escalated into a physical altercation—just as in their past disputes—and Willis choked her before she "poked" him with the knife after feeling like she would die from strangulation, supporting her claims of both passion and provocation. There is no contravening evidence other than Rankin's failure to tell the police who interviewed her that she had been choked and their failing to notice signs of choking on their own. And M.R.'s testimony that she ran to retrieve a bat to get Willis off her mother is corroborating evidence that Rankin's story was true—as is the evidence of the marks found on her neck and wrist that night.

Rankin also told Detective Hernandez that Willis walked away towards the Cutlass, sat in the car and then got out again, "took off his shirt," "grabbed his chest," and fell to the ground. That is when Rankin first called the police and then rushed Willis to the hospital. Rather than pursue Willis when he walked away, Rankin sat

18

in her car and cried until she noticed Willis collapse to the ground. She called 911 and drove about 95 miles per hour to take Willis to the hospital for his stab wound. There is no contrary evidence as to what happened and the sequence of events. Rather, Rankin's story is supported by the evidence that several drops of blood were subsequently found on the ground in the area where Rankin testified she picked Willis up and got him back into the car to drive to the hospital. And it is undisputed that she did, in fact, call the police when she saw him stop the car and collapse and that she immediately rushed him to the hospital in an effort to save him. These are all exactly the types of actions that supported submission of a jury instruction on sudden passion in both *Beltran* and *Trevino*, and they support a finding of sudden passion here where, again, there is no contrary evidence.

In short, there is no evidence to support the conclusion that Rankin did *not* act out of sudden passion but acted in cool reflection. The only evidence to the contrary is that she held back details of her story from the police who interrogated her by not reporting that Willis choked her or showing signs of choking that they noticed on their own. But whether Willis choked her or not, there is absolutely no evidence to support the conclusion that she brought her knife to the scene to stab him, that she was not angry and frustrated when she stabbed him, and that she intended to kill him.

The jury also heard other evidence from which it could have found sudden passion. M.R. testified that she peered outside the apartment because her mom was

19

taking too long to return home. She saw Willis drive into the parking lot across the street and park next to Rankin's car. M.R. also testified that she heard Willis yelling, saw him behaving aggressively, and noticed that "his nostrils had flared up" and that his face turned "very bright red" with "rage." Finally, M.R. testified that she saw Willis grab and lunge at Rankin, causing her to run back into the house to get a bat to defend her mother. And photographs taken of Rankin that night and admitted into evidence showed several red marks on her neck and wrist.

Although the officers who interviewed Rankin on the evening of the stabbing testified that Rankin omitted the details about the argument and physical altercation when she described to them how she stabbed Willis and that she varied her story, and although they testified that they did not see any signs of injury to her, this is not in itself evidence that things did not occur as Rankin and M.R. testified. Their accounts of the material facts are not only consistent with each other but supported by physical evidence. Even if a reasonable jury believed that Rankin was not telling the truth when she said Willis choked her, it would still have to disregard the physical evidence of the marks on her neck and wrist.

Also, importantly, no evidence regarding the circumstances under which Willis was killed supports the mens rea of murder prepared for in advance and committed in cool reflection; instead, the uncontroverted evidence supports sudden passion even if Willis did not choke Rankin. That is, the uncontroverted evidence

supports only the conclusion that Rankin was angry at Willis and frustrated by his refusal to answer her phone calls, his refusal to explain where he had been, and his language towards her. And this uncontroverted evidence supports the inference that it was this provocation that caused her to use the knife she was already holding in her hand to pry open the hood of her disabled car to "poke" Willis. The only reasonable inference from these facts is that "a causal connection existed 'between the provocation, passion, and homicide,'" as opposed to a murder committed in cool reflection under circumstances that did not indicate passionate anger and frustration at Willis's behavior, the immediate provocation for Rankin's stabbing him. *See Beltran*, 472 S.W.3d at 290.

I see no evidence to support an essentially different scenario with respect to any of the factors required to prove sudden passion as opposed to murder. Literally nothing supports the majority's characterization of the evidence set out above as showing that Rankin was capable of "cool reflection" before, during, and after the stabbing. Yet the majority characterizes Rankin's past history with Willis and her growing anger and frustration with him and telling him she would fix the car herself as evidence of her "cool reflection" before poking him with the knife. Slip Op. at 27. It characterizes her "'call[ing] out for help from God,' despite losing her breath from Willis's chokehold'" as evidence of her "ability to pause" and coolly reflect as she "poked" him with the paring knife she had taken out to open the hood and still held

21

in her hand. *Id.* at 27–28. It characterizes her sitting in her car and crying after the stabbing as "show[ing] that she was capable of cool reflection." *Id.* at 28. And it concludes from this that "Rankin's own testimony does not support a finding that Rankin had acted under the immediate influence of sudden passion arising from adequate cause." *Id.*

Yet these are exactly the type of facts that the Texas Court of Criminal Appeals has described as proof of sudden passion—not its direct opposite. *See Beltran*, 472 S.W.3d at 293–95 (holding that evidence supported defendant's requested jury instruction on sudden passion where there was evidence that (1) defendant acted under immediate influence of terror, testifying that he "panicked" and was "screaming in panic" when he awoke to find complainant behind him licking his anus, thus (2) providing evidence of provocation by complainant that (3) could have rendered defendant incapable of cool reflection before acting, where (4) jury could arguably have deduced, from defendant's testimony, that complainant's sexual assault triggered chain reaction that resulted in defendant's crying and panicked screaming and, ultimately, in complainant's stabbing death); *Trevino*, 100 S.W.3d at 234–35, 239–41 (holding that defendant was entitled to jury charge on sudden passion where detective testified that defendant informed him (1) he had altercation with complainant over phone numbers of other women she found in his wallet; (2) she confronted defendant with gun and pulled

trigger; (3) defendant retrieved his own gun, and complainant was shot during struggle for guns; (4) defendant's sister testified that when defendant called her after shooting occurred he "was freaking out" and, when she arrived, she found defendant "crying and shaking"; and (5) another detective testified that when he entered defendant's home, defendant was kneeling over complainant and said, "you gotta help her").

In my view, the majority's opinion is contradictory to the law. If its lead were to be followed, there could never be a sustainable jury finding of sudden passion, and the defendant's burden on sudden passion would be effectively raised to proof beyond a reasonable doubt. The defense would be negated by the very facts held by the Court of Criminal Appeals to sustain it.

Viewing all of the evidence in a neutral light, I would hold that the jury's finding adverse to Rankin's sudden passion defense was so against the great weight and preponderance of the evidence as to be manifestly unjust. *See Matlock*, 392 S.W.3d at 671. Accordingly, I would sustain Rankin's third issue.

## Conclusion

I would reverse the trial court's judgment convicting appellant of murder, and I would remand the case for a new punishment hearing.


Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Kelly, and Landau.

Justice Keyes, dissenting.

Publish. TEX. R. APP. P. 47.2(b).