

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

### NO. PD-0795-21

---

### ROBERT EARL HART, Appellant

### v.

### THE STATE OF TEXAS

---

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE FOURTEENTH COURT OF APPEALS
### HARRIS COUNTY

---

SLAUGHTER, J., delivered the opinion of the Court in which KELLER, P.J., HERVEY, RICHARDSON, YEARY, NEWELL, and McCLURE, JJ., joined. KEEL and WALKER, JJ., concurred.

## O P I N I O N

The question we must resolve in this case is whether, during Appellant's trial for the murder of his daughter's allegedly abusive ex-boyfriend, his trial counsel was ineffective for declining the trial court's offer to include a sudden-passion jury instruction in the punishment-phase charge. *See* TEX. PENAL CODE § 19.02(d) (providing that, "[a]t

the punishment stage of a trial, the defendant may raise the issue as to whether he caused the death under the immediate influence of sudden passion arising from an adequate cause;" if the defendant proves this issue by a preponderance of the evidence, "the offense is a felony of the second degree").[1] In this case, we cannot find counsel deficient because the existing direct-appeal record is inadequately developed. Had the record contained a motion for new trial raising an ineffectiveness claim, counsel would have had an opportunity to explain why he declined the sudden-passion instruction. Such an explanation could have contained a plausible strategic reason for counsel's decision— namely, that pursuing a sudden-passion strategy at the punishment phase could have been perceived by the jury to be inconsistent with Appellant's primary defensive strategy of depicting himself as a calm and rational person who acted lawfully in self-defense. Therefore, based on the current record, we cannot hold that counsel's decision to decline the sudden-passion instruction was so outrageous that no competent attorney would have

---

[1] The statute additionally provides the following definitions for adequate cause and sudden passion:

    (a)  In this section:

        (1) "Adequate cause" means cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection.

        (2) "Sudden passion" means passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation.

TEX. PENAL CODE § 19.02(a).

engaged in it. Accordingly, we reverse the court of appeals' judgment granting Appellant a new punishment trial, and we remand the case to that court for further proceedings.

## I.        Factual Background

The evidence at trial revealed that Ronald Lynn Ray, the victim in this case, was engaged in a tumultuous, on-again-off-again relationship with Appellant's adult daughter, Stephanie. According to Stephanie, the relationship was one filled with violent abuse. She explained that Ray would make violent threats towards her and her family and that he had previously shown up to the Hart residence uninvited, leading to the family calling the police. Stephanie characterized Ray as controlling, testified that she "was terrified" for her life, and noted that Ray always carried a gun. She also expressed a fear that Ray would harm her family, stating, "I was afraid he was going to hurt anybody I was around, that he was going to kill them, that he was going to hurt them just to hurt me."

On September 22, 2016, shortly before 1 p.m., Ray showed up unannounced in the street outside the Hart family home. Inside the home at the time were Appellant, his wife Elizabeth, Stephanie, and his other daughter.[2] The family's home had a security camera with a viewing monitor inside. Thus, when Ray's vehicle pulled up to the house, both of Appellant's daughters saw it. Ray parked his vehicle across the street, got out, removed his shirt, and began smoking a cigarette. Panicked, the girls told their father that Ray was outside. Around a minute after Ray's arrival, Appellant went outside to confront Ray. The

---

[2] Although Stephanie had been living with Ray, she was staying with her parents at the time of the shooting.

entire interaction that followed was captured by Appellant's security camera system, but no audio was recorded.

In the video footage, Ray is seen standing next to the open driver-side door of his car in the street. Appellant walks towards Ray while holding a gun at his side. Appellant and Ray briefly yell at one another, but it is unknown what exactly was said. (Appellant told officers that Ray used "vulgar language," while Stephanie testified that she heard Appellant shout that Ray was "not supposed to be here.") Within seconds, Appellant points the pistol at Ray, who puts his hands up and shrugs his shoulders. Appellant then almost immediately begins firing at Ray, who runs towards the back of his vehicle and around to the passenger side. After pacing for a few seconds, Ray collapses near the back of his vehicle.

Around ten seconds after Ray's collapse, Appellant walks up to Ray's body. Appellant removes an object from his own pocket, briefly places the object near Ray, then quickly picks it back up, and a puff of smoke can be seen before Appellant places the object back down near Ray's right hand. Though it was disputed by the defense, the State later sought to prove at trial that Appellant had placed a small revolver near Ray's hand, and the puff of smoke was Appellant firing the revolver to make it appear as if Ray had fired it.

The officers who arrived on the scene searched Ray's vehicle but did not find any weapons inside. Additionally, there were no weapons found on Ray's person aside from the revolver that was lying on the ground near Ray's hand. Officers then observed that Appellant had a security system and asked him if the cameras worked. Appellant initially told officers that the cameras did not work and were there only to dissuade criminals.

However, officers discovered that the cameras were, in fact, operational and had recorded the entire incident. After watching the video of the shooting, officers placed Appellant under arrest for Ray's murder.

## II.     Trial and Appeal

### A.     The Guilt-Innocence Phase

At Appellant's jury trial, the State first called several law-enforcement officers who responded to the scene. Deputy Taylor testified that Appellant was "fairly calm," composed, and overall cooperative. Officer Davis testified that Appellant told officers he went outside to confront Ray and heard a gunshot before returning fire. Officer Davis also testified that Appellant remarked that Ray had arrived at the residence on a past occasion and pulled a weapon, so Appellant claimed he believed that Ray had a weapon on him. During the officers' testimony, the surveillance video showing the shooting was admitted into evidence and played for the jury.

Based on what was presented and argued by defense counsel, it appeared that the defensive strategy during the guilt phase of trial was to seek an acquittal on the grounds of either self-defense or defense-of-others. To support these defenses, Appellant relied on Stephanie's testimony describing Ray's history of abusing her and his prior threats and harassment towards the family. Appellant did not testify.

The State's focal point at trial was the surveillance footage, with the State arguing that the footage disproved Appellant's defensive claims by demonstrating that Ray never physically threatened anyone and by showing that Appellant attempted to stage his self-defense claim.

In his closing arguments, defense counsel emphasized Appellant's fatherly desire to protect Stephanie from Ray:

> The question has always been whether it was a justified shooting . . . [Appellant] is a father. . . . [Ray was] a young man who had dated his daughter, abused his daughter, terrorized his daughter, and who was known to carry firearms. . . .

> Without any invitation [Ray] shows up at the house . . . . You saw him take off his shirt. We can't see what was going on. But there was a lot of trash talking going on. We know this. Very likely threatening.

> He's obsessed with Stephanie. He wants her. He wants her now. [Appellant], as a good father, has had enough. He goes out with his firearm hoping [Ray] would leave. And instead [Ray] stood there. . . .

> I'll let you be the judge on the video of whether it was aggressive, whether Mr. Ray's posturing was aggressive. Certainly with that short of a distance . . . [Ray] could have gotten over there. That danger was apparent despite what the prosecutor just told you.

> This nightmare has gone on for this family for three years. [Appellant] would like for you to come back and tell him that he did the right thing. Tell him the shooting was justified. Find him not guilty, and let him go on his way.

At the conclusion of trial, the jury rejected Appellant's defensive claims and convicted him of Ray's murder.

## B. Punishment Phase

During the punishment phase, the State offered no additional evidence and did not make a sentencing recommendation to the jury. The defense continued to emphasize Appellant's caring and family-oriented nature, as well as his desire to protect Stephanie. Counsel also emphasized Appellant's reputation in the community by calling seven character witnesses, which included family members, neighbors, and religious leaders. These witnesses testified that Appellant was a non-violent person, active church member, and loving family man. One witness described Appellant as "compassionate,"

"tenderhearted," and a "calm man." The State engaged in minimal, if any, cross-examination of these witnesses.

During the charge conference for the punishment-phase jury instructions, the parties and the court briefly discussed whether a sudden-passion instruction should be included:

Court:      Okay. So, I'm reading the jury charge with respect to the punishment phase of trial. And I proposed a—just for proposals—a special issue regarding sudden passion, adequate cause sudden passion. And, Mr. Dixon, you are telling you [sic] me that you do not want that in there. As you've discussed with the State, you don't believe the facts support it; is that correct?

Mr. Dixon:  That is correct, Judge. I went through about six pieces of case law, and there was one that was directly on point and it just— it wasn't supported by the facts.

Court:      So, I'm going to take out the sudden passion part of it.

Based on this exchange, the sudden-passion instruction was ultimately excluded from the punishment charge given to the jury.

After resting its punishment case, defense counsel gave a brief closing argument in which he asked the jury to sentence Appellant at the lower end of the punishment range:

I wanted today to give you a little bit of insight into who Robert Hart is to help you make your decision on punishment. For 59 years Robert Hart has been relatively trouble-free. For 40 years he's been married, 38 years he's been a father. You heard several people up there say Robert protects his family. . . . What he did may not legally be considered defending, but it's certainly protecting. Mr. Ray hounded his daughter. He terrorized her. He abused her. He'd [Appellant] had enough. I get it. I'm a dad.

. . . . You've got a wide range of punishment available to you. . . . I think it is appropriate if you were to start this on the very low end of the punishment [range]. He's an ill man. What you give him may very well be a life sentence,

according to what his wife told you yesterday.[3] . . . I realize there was a life lost, but I don't know what else to say. Thank you very much for your time.

The jury ultimately assessed a sentence of 30 years' imprisonment and imposed a $5,000 fine. Appellant did not file a motion for new trial.

### C. On Appeal

On direct appeal, Appellant argued, among other things, that he received ineffective assistance of counsel during the punishment phase based on counsel's rejection of the sudden-passion instruction.[4] *Hart v. State*, 631 S.W.3d 458, 464 (Tex. App.—Houston [14th Dist.] 2021). In a 2-1 decision, the Fourteenth Court of Appeals agreed with Appellant and reversed the jury's verdict on punishment. *Id.* at 469. With respect to deficient performance, the court reasoned that Appellant would have been entitled to the instruction based on the prior history of violent and threatening acts by Ray; the fact that Stephanie and her sister "screamed" when they saw Ray arrive at the house; and Ray's "provocative behavior" in parking his car outside, taking his shirt off, and allegedly yelling profanities at Appellant. *Id.* at 465–66. The court also determined that, because counsel's

---

[3] Appellant's wife, Elizabeth, testified about Appellant's declining health. At the time of trial, Appellant was suffering from chronic obstructive pulmonary disease (COPD), bronchitis, severe emphysema, and had recently been diagnosed with stage-four lung cancer and colon cancer.

[4] Appellant raised two additional points of error on direct appeal. In his first point of error, he contended that his counsel was ineffective for failing to suppress or object to the admission of the surveillance footage during the guilt phase. In his third point of error, he contended that the trial court erred by failing to, *sua sponte*, include an instruction on sudden passion during the punishment phase. *Hart*, 631 S.W.3d at 460–61. As to the first point of error, the court of appeals held that trial counsel was not ineffective for failing to file a motion to suppress because Appellant could not show that the motion would have been granted. *Id.* at 464. As to the third point of error, the court of appeals did not reach that complaint because it had already reversed Appellant's punishment based on the ineffectiveness complaint before us in this PDR proceeding. *Id.* at 469.

basis for rejecting the sudden-passion instruction was his incorrect belief that the facts did not support it, such erroneous reasoning "cannot form the basis for a sound trial strategy." *Id.* at 466. With respect to the question of prejudice, the court of appeals further held that there was a "reasonable probability" the jury would have found in Appellant's favor on the issue of sudden passion had it received such an instruction, thereby resulting in a shorter sentence. *Id.* at 469. Accordingly, it reversed the trial court's judgment on punishment and remanded for a new sentencing hearing. *Id.*

Justice Wise dissented. *Id.* at 469–71. He contended that the majority had "eviscerate[d] any discretion that seasoned criminal defense attorneys may exercise to pursue one defensive strategy over another." *Id.* at 469. He observed that counsel had not been afforded an opportunity to explain his actions, and therefore the court should apply the "strong presumption" that counsel's decision to decline the sudden-passion instruction "was the result of reasonable strategy." *Id.* Looking to the facts of this case, he observed that counsel chose to portray Appellant "not as a hot-headed man who was overcome with emotions, but as a considerate family-man who wanted to protect his daughter from a persistent problematic boyfriend." *Id.* at 470. Given the weakness of the evidence supporting sudden passion, Justice Wise opined that counsel should not be held ineffective for pursuing an alternate strategy. *Id.*

We granted the State's petition for discretionary review on two grounds to evaluate the court of appeals' holdings as to both the deficiency and prejudice prongs of Appellant's ineffective-assistance claim.

## III. Analysis

We agree with Justice Wise's dissenting position that because counsel had not been afforded an opportunity to explain his actions, the court of appeals should have applied the "strong presumption" that counsel's decision to decline the sudden-passion instruction "was the result of reasonable strategy." *Id.* at 469. Given the facts at trial and the apparent defensive strategy pursued, trial counsel may have declined the instruction because pursuing sudden passion at the punishment phase may have been inconsistent with counsel's primary defensive theory that Appellant acted rationally and reasonably in shooting the victim out of a justifiable desire to protect his daughter. We do not know, however, at this juncture whether this was, in fact, the basis for counsel's rejection of the sudden-passion instruction. That is because Appellant did not file a motion for new trial raising this ineffectiveness claim, which would have given trial counsel an opportunity to explain his decision. Based on the current record on direct appeal, we cannot find counsel deficient unless his actions could not be justified by *any* reasonable trial strategy.

A.      The *Strickland* Standard for Ineffective Assistance of Counsel

Evaluating claims of ineffective assistance of counsel under the Sixth Amendment involves a two-pronged test: (1) whether counsel was deficient, and (2) whether the defendant suffered prejudice as a result of counsel's error. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Because we resolve this case on the deficiency prong, we do not address prejudice.

To establish that counsel's actions were deficient, the appellant must show, by a preponderance of the evidence, that counsel's actions fell below an objective standard of reasonableness. *Id.* at 687–88; *Hernandez v. State*, 726 S.W.2d 53, 55 (Tex. Crim. App.

1986). There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). Courts should consider the reasonableness of counsel's actions at the time, rather than viewing such actions through the benefit of hindsight. *Id.* The Court should make this determination in light of all the circumstances in order to determine if the actions fall outside the wide range of professionally competent assistance. *Id.* at 690.

Claims of ineffective assistance must be firmly rooted in the record. *Thompson v. State*, 9 S.W.3d 808, 814 (Tex. Crim. App. 1999). "Under most circumstances, the record on direct appeal will not be sufficient to show that counsel's representation was so deficient and so lacking in tactical or strategic decision-making as to overcome the strong presumption that counsel's conduct was reasonable and professional." *Scheanette v. State*, 144 S.W.3d 503, 510 (Tex. Crim. App. 2004). Given this fact, trial counsel should ordinarily be afforded an opportunity to explain his conduct before being denounced as ineffective. *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005). In the absence of such an opportunity, when faced with an undeveloped record on direct appeal, "[c]ourts 'commonly assume a strategic motive if any can be imagined and find counsel's performance deficient only if the conduct was so outrageous that no competent attorney would have engaged in it.'" *Okonkwo v. State*, 398 S.W.3d 689, 693 (Tex. Crim. App. 2013) (quoting *Andrews v. State*, 159 S.W.3d 98, 101 (Tex. Crim. App. 2005)). Counsel's actions are considered deficient only if the court finds, as a matter of law, that "no reasonable trial strategy could

justify trial counsel's acts or omissions, regardless of his or her subjective reasoning." *Lopez v. State*, 343 S.W.3d 137, 143 (Tex. Crim. App. 2011).

To demonstrate deficient performance based on trial counsel's failure to request a defensive jury instruction, an appellant must show that he was entitled to such an instruction. *Fuentes v. State*, 991 S.W.2d 267, 272 (Tex. Crim. App. 1999). However, even if the appellant is entitled to a defensive instruction, the decision to forgo such an instruction may not be objectively unreasonable, as these decisions are frequently grounded in trial strategy. *Okonkwo*, 398 S.W.3d at 697. "[J]ust because a competent defense attorney recognizes that a particular defense *might* be available to a particular offense, he or she could also decide it would be inappropriate to propound such a defense in a given case." *Vasquez v. State*, 830 S.W.2d 948, 950 n.3 (Tex. Crim. App. 1992) (per curiam) (emphasis in original).

### B. The direct-appeal record is undeveloped and fails to adequately reflect counsel's reasoning.

At the outset, we observe that the record in this case is practically silent regarding counsel's reasons for declining the sudden-passion instruction. In the brief exchange on the record during the charge conference, counsel indicated that he had reviewed some caselaw and simply did not believe the instruction was "supported by the facts." The court of appeals determined that this statement necessarily meant counsel believed (incorrectly, in its view) that Appellant was not lawfully *entitled* to the instruction. *See Hart*, 631 S.W.3d at 466. It thus concluded that counsel's mistaken belief about the law could not form the basis for sound trial strategy. *Id.* We disagree that counsel's statement was so clear in

reflecting his reasoning for declining the instruction.[5] Ultimately, this single sentence on the record does not necessarily demonstrate counsel's reason for declining the instruction.

This case falls into the category of ineffective-assistance claims raised on direct appeal for which the record is undeveloped because it does not adequately reflect counsel's reasoning. *See Scheanette*, 144 S.W.3d at 510. Under these circumstances, wherein counsel has had no opportunity to explain his actions, we will assume a strategic motive, if one can be ascertained, and find counsel deficient only if his conduct was so outrageous that no competent attorney would have engaged in it or, stated differently, if no reasonable trial strategy could justify counsel's actions. *See Okonkwo*, 398 S.W.3d at 693; *Lopez*, 343 S.W.3d at 143.

### C.   Because a reasonable trial strategy could conceivably justify counsel's actions, Appellant's ineffective-assistance claim must fail.

As Justice Wise observed in his dissenting opinion, counsel's strategy throughout the trial of this case was to portray Appellant as a rational, considerate family man who was merely seeking to protect his daughter from an abusive boyfriend, rather than as someone "who was overcome with emotions[.]" *Hart*, 631 S.W.3d at 470 (Wise, J., dissenting). Arguably, it could have been perceived as inconsistent with counsel's primary

---

[5] *See Hart*, 631 S.W.3d at 470 (Wise, J., dissenting) ("If the record in this case reveals anything about counsel's reason for not requesting a sudden passion instruction, it is that counsel affirmatively considered the merits of requesting the instruction and rejected it. In light of counsel's consideration of case law that counsel determined was 'directly on point,' counsel concluded that he did not want a sudden passion instruction. Appellate court justices reviewing a cold record years after the fact have no idea what case law trial counsel considered and whether counsel's decision not to pursue a sudden passion instruction was the product of reasonable trial strategy.").

strategy to contend that the jury should find at the punishment phase that Appellant acted in sudden passion (i.e., that he was experiencing "anger, rage, resentment, or terror" that had rendered his mind "incapable of cool reflection"). *See* TEX. PENAL CODE § 19.02(a). Counsel is not deficient for declining to pursue a defensive instruction if pursuing such a theory would be inconsistent with a theory he advanced at trial. *See Okonkwo*, 398 S.W.3d at 697 (concluding that counsel "was not objectively unreasonable by failing to request an instruction on mistake of fact because that theory was inconsistent with a theory that counsel advanced at trial, and it would have misled the jury as to the State's burden of proof"). In this case, counsel may have determined that changing defensive tactics at the punishment phase would undermine Appellant's credibility with the jury and harm his overall chances of obtaining a shorter sentence. *See, e.g.*, *Shanklin v. State*, 190 S.W.3d 154, 160-61, 161 n. 1 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd) ("[I]t may not be sound strategy to present inconsistent defenses.").

In his brief on discretionary review, Appellant contends that no reasonable trial strategy can justify counsel's conduct here because a sudden-passion instruction could have only helped Appellant and could not have hurt him. Appellant correctly notes that, had the jury found in his favor on the issue of sudden passion, the effect would have been to reduce the range of punishment to that of a second-degree felony, with a possible punishment of 2 to 20 years' imprisonment, down from a first-degree range, which carries a possible punishment of 5 to 99 years' or life imprisonment. *See* TEX. PENAL CODE §§ 19.02(c), (d), 12.32(a), 12.33(a). We decline to hold, however, that the mere existence of an instruction that theoretically could have helped Appellant means counsel is *per se* ineffective for

failing to request it, regardless of counsel's strategy and regardless of the facts of the case. Notably, Appellant bore the burden of production and persuasion with respect to the issue of sudden passion. *Beltran v. State*, 472 S.W.3d 283, 289 (Tex. Crim. App. 2015). As indicated above, counsel could have reasonably determined, in light of the facts of the offense and his overall defensive strategy, that arguing sudden passion at the punishment phase would not likely result in a lower sentence for Appellant—either because the facts raising that issue were so weak that the jury was not likely to find in his favor on that issue, and/or because arguing sudden passion would be inconsistent with his primary defensive strategy and would create a credibility problem with the jury.

Therefore, to the extent that counsel decided to stay the course at the punishment phase by continuing to argue that Appellant had acted rationally and reasonably in seeking to protect his daughter, rather than pursuing a sudden-passion argument that would have required the jury to find that Appellant had lost his capacity for cool reflection and acted out of anger or terror, we decline to hold based on the current record and at this juncture that such a strategy is unreasonable as a matter of law. Because such a strategy is not so outrageous that no reasonable attorney would have engaged in it, we will not hold counsel deficient on this undeveloped direct-appeal record.

## IV.    Conclusion

Because counsel has not been afforded an opportunity to explain his motives, and because counsel's decision to reject the sudden-passion instruction can be traced to a conceivable trial strategy that he may have reasonably believed would be inconsistent with the sudden-passion instruction, we hold that based on the current record, we cannot find

counsel was deficient for rejecting the instruction. We reverse the court of appeals' judgment as to punishment and remand for consideration of Appellant's remaining point of error raised on appeal.

DELIVERED: April 26, 2023

PUBLISH