# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## ON MOTION FOR REHEARING

## NO. 03-22-00318-CR

**Linda Marie Coolbaugh, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE COUNTY COURT AT LAW NO. 1 OF COMAL COUNTY
### NO. 2017CR2052, THE HONORABLE RANDAL C. GRAY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

We withdraw our previous opinion and judgment issued on July 27, 2023, and substitute the following opinion and judgment in their place. We deny the motion for rehearing filed by appellee the State of Texas.

A jury convicted appellant Linda Marie Coolbaugh of the misdemeanor offense of driving while intoxicated. *See* Tex. Penal Code § 49.04(b). Punishment was before the district court, which sentenced Coolbaugh to 180 days in jail but suspended imposition of the sentence and placed her on community supervision for ten months. In her sole issue on appeal, Coolbaugh contends that the trial court erred in refusing to instruct the jury on her defense of necessity. On this record and on these facts, we conclude that Coolbaugh was entitled to the instruction and suffered some harm from its absence from the jury charge. Accordingly, we will reverse the judgment of conviction and remand for a new trial.

BACKGROUND

The jury heard evidence that at approximately 3:30 a.m. on April 22, 2017, a 911 caller reported a vehicle on southbound I-35 in Comal County that was failing to maintain a single lane of traffic. Officers with the New Braunfels Police Department initiated a traffic stop on the vehicle and began investigating the vehicle's driver and sole occupant, later identified as Coolbaugh, for driving while intoxicated. The police stopped Coolbaugh south of New Braunfels, and they learned that she had been coming from Austin.

Officer Terry Flugrath testified that during the investigation, he asked Coolbaugh "what took place that night," and Coolbaugh told him that she had gone out to a club with her boyfriend. She admitted that she had been drinking while they were out. When they returned home later that night, she went to bed, but her boyfriend went through her phone and "found an Instagram message from another male." "At that point he became physical, so she needed to get in her vehicle and get out of there." On cross-examination, Flugrath testified to more details that Coolbaugh had relayed to him regarding the assault: the boyfriend had choked her, pulled her out of bed, and pulled her by her hair. Flugrath also testified that Coolbaugh appeared upset and was crying during the investigation and that he observed that she had blood in one of her eyes and bruising on one of her cheeks. Copies of photographs showing those injuries were admitted into evidence. Also, in a video recording of the traffic stop taken from Flugrath's patrol car dash camera, which was admitted into evidence, Coolbaugh can be heard crying and describing the assault.

After conducting field sobriety tests on Coolbaugh, Officer Flugrath arrested her for driving while intoxicated and transported her to the Comal County Jail, where Coolbaugh provided a breath sample for testing. The test, which a forensic scientist testified "involve[d]

2

two analytical results for the subject," showed that Coolbaugh's blood-alcohol level was .123 and .119 grams of alcohol for 210 liters of breath. The legal limit was .08 grams.

Coolbaugh testified in her defense. Coolbaugh recounted that she lived in Schertz and that on the night of the incident, she was dating a man who lived in South Austin, close to I-35 and "one exit off of Riverside." She testified that after a night of drinking, she and her boyfriend arrived at his house, where she immediately fell asleep on his bed. The next thing she remembered, she was awakened by her boyfriend choking her and grabbing her by the back of her hair. She explained, "I was laying in the bed face down, and he had grabbed my hair and pulled me back, and then he started choking me." Coolbaugh woke up confused by the assault and did not know what time it was or for how long she had been asleep. She recalled losing her breath as her boyfriend continued choking her and screaming at her about a message on her phone from another man. After her boyfriend stopped choking her, Coolbaugh tried to catch her breath while he "grabbed [her] shoes and keys on the ground, and he grabbed [her] hair and he dragged [her] out of the house and just kept hitting [her] with shoes and just kept dragging [her] to the sidewalk." She added, "He had the back of my hair. He just kept screaming at me, and I kept telling him he was hurting me and he wouldn't stop." The boyfriend then hit Coolbaugh in the face, and she "went down and blacked out."

When she regained consciousness, Coolbaugh found herself laying on the street and saw her boyfriend "sitting on the porch" of his house. Coolbaugh "thought that was her way to get out," so she grabbed her car keys, shoes, and phone, which her boyfriend had "thrown down on the ground," and "got in [her] car," which was "parked right at the street where [she] was laying." When she got in the car, her boyfriend "came running back at [her], and he was jumping on the car and hitting the windows really hard." Coolbaugh "thought he was going to

3

break the windows, screaming at [her] that this wasn't over, it's not over till he says it's over, that he was coming for [her]." At that point, Coolbaugh "started the car and [she] backed up really fast and went out."

Coolbaugh testified that her phone was intact, but "the screen was cracked" and "[i]t was very hard to use [her] phone" as she was driving. She "was trying to use it, but it was cracked and [she] couldn't push things correctly on the phone." As she drove, she tried to use an app on her phone to lock her credit cards, as she did not know if her boyfriend "had them or not," but the app "wasn't working," and she had not been able to use her phone at all during the drive. When asked on cross-examination if she had made any calls on her phone, Coolbaugh testified, "I couldn't really use my phone. It was so cracked I couldn't push any of the buttons." She added, "I'm not sure anybody would have answered my call at 3:00 in the morning." Despite being unable to use her phone, Coolbaugh was able to see incoming calls and texts on her phone, and her boyfriend "was constantly calling" her "every time [she] tried to look at the phone." There were also "text messages coming through from him."

Coolbaugh further testified that her goal while driving was "[t]o find somewhere safe." She "thought he was going to kill [her], so [she] didn't know what else to do." When asked to identify the "safe spot" to where she was driving, Coolbaugh testified, "My house." She explained that she believed her home would be a safe place for her because it was in a gated community and she had an alarm system there. Coolbaugh testified that she made no stops along the way before she was stopped by the police. She did not know of any other safe places to stop between South Austin and her home in Schertz at 3:30 in the morning and did not know "anybody that lives in between those places." Coolbaugh also testified that she began to feel safe "[w]hen she started driving in the car and knowing [she] was headed home." She explained,

4

I really wasn't feeling safe just driving. I felt safe when I was going to be able to be home to be safe because he kept saying that he was coming after me, and so I didn't know technically where he was at that point, if he was close by or anything on the highway.

When asked if she knew her boyfriend was following her, Coolbaugh testified,

From what I gathered through the text messages, yes. I don't know if he was because I couldn't tell, so I have no idea how long it might have taken him to leave the house or at what point he had left or if he left. I don't know.

When asked how she had been able to access the text messages, Coolbaugh explained that although she was unable to open the messages, she was able to read them, and he "had texted that he was coming after [her] and [she] wasn't safe. It was like three texts and then he was calling."

Coolbaugh admitted during her testimony that she had been driving while intoxicated. She testified that she did so "because [she] was scared." She added, "I was upset. I had no idea what was going on, and I was terrified. I just—I didn't really think about that point of my intoxication or anything like that at that time."

During the charge conference after the close of evidence, Coolbaugh requested an instruction on the defense of necessity, which the trial court denied. The jury subsequently found Coolbaugh guilty of driving while intoxicated, and the trial court placed her on community supervision as noted above. This appeal followed.

## STANDARD OF REVIEW

"The trial court must provide the jury with 'a written charge distinctly setting forth the law applicable to the case.'" *Maciel v. State*, 631 S.W.3d 720, 722 (Tex. Crim. App.

5

2021) (quoting Tex. Code Crim. Proc. art. 36.14). "The trial court must instruct the jury on statutory defenses, affirmative defenses, and justifications whenever they are raised by the evidence in the case." *Id*. (citing *Walters v. State*, 247 S.W.3d 204, 208-09 (Tex. Crim. App. 2007)). Under Texas Penal Code § 2.03(c), "a defense is supported (or raised) by the evidence if there is some evidence, from any source, on each element of the defense that, if believed by the jury, would support a rational inference that that element is true." *Shaw v. State*, 243 S.W.3d 647, 657-58 (Tex. Crim. App. 2007); *see* Tex. Penal Code § 2.03(c). "In determining whether a defense is thus supported, a court must rely on its own judgment, formed in the light of its own common sense and experience, as to the limits of rational inference from the facts proven." *Shaw*, 243 S.W.3d at 658. "A defendant is entitled to an instruction on every defensive issue raised by the evidence, regardless of whether the evidence is strong, feeble, unimpeached, or contradicted, and even when the trial court thinks the testimony is not worthy of belief." *Walters*, 247 S.W.3d at 209. "A defendant's testimony alone is sufficient to raise a defensive issue requiring an instruction in the charge." *Beltran v. State*, 472 S.W.3d 283, 290 (Tex. Crim. App. 2015) (citing *Shaw*, 243 S.W.3d at 662); *see Hayes v. State*, 728 S.W.2d 804, 807 (Tex. Crim. App. 1987). "But the evidence must be such that it will support a rational jury finding as to each element of the defense." *Shaw*, 243 S.W.3d at 658. This requirement "serves to preserve the integrity of the jury as the factfinder by ensuring that it is instructed as to a defense only when, given the evidence, that defense is a rational alternative to the defendant's criminal liability." *Id*. "Whether a defense is supported by the evidence is a sufficiency question reviewable on appeal as a question of law." *Id*. "When reviewing a trial court's ruling denying a requested defensive instruction, we view the evidence in the light most favorable to the

defendant's requested instruction. *Maciel*, 631 S.W.3d at 722 (citing *Bufkin v. State*, 207 S.W.3d 779, 782 (Tex. Crim. App. 2006)).

## DISCUSSION

**The requirements of the necessity defense**

"Texas Penal Code section 9.02 provides that '[i]t is a defense to prosecution that the conduct in question is justified under this chapter.'" *Id*. (quoting Tex. Penal Code § 9.02). One such justification is the statutory defense of necessity, which "provides in relevant part that conduct that is otherwise criminal 'is justified if: (1) the actor reasonably believes the conduct is immediately necessary to avoid imminent harm [and] (2) the desirability and urgency of avoiding the harm clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct.'"[1] *Id*. (quoting Tex. Penal Code § 9.22).

The first prong requires evidence that the defendant possessed a "reasonable belief" that her conduct was immediately necessary to avoid "imminent" harm. "Reasonable belief" means a belief that would be held by an ordinary and prudent person in the same circumstances as the actor. Tex. Penal Code § 1.07(a)(42). "In most cases, whether a defendant was prompted to act by a reasonable belief is a question for the trier of fact." *Brazelton v. State*, 947 S.W.2d 644, 648 (Tex. App.—Fort Worth 1997, no pet.). "A defendant's belief that conduct

---

[1] A third requirement of the necessity defense is that "a legislative purpose to exclude the justification claimed for the conduct does not otherwise plainly appear." Tex. Penal Code § 9.22(3). No such exclusion appears in the DWI statute. *See Spakes v. State*, 913 S.W.2d 597, 598 (Tex. Crim. App. 1996) ("The plain language codifying the necessity defense evinces a legislative intent that the defense apply to all offenses unless the legislature has specifically excluded it from them."); *see also Bowen v. State*, 162 S.W.3d 226, 229 (Tex. Crim. App. 2005) (looking only to plain text of statute to determine whether legislature excluded justification).

was immediately necessary to avoid imminent harm may be deemed unreasonable as a matter of law, however, if undisputed facts demonstrate a complete absence of evidence of immediate necessity or imminent harm." *Id.*

"'Imminent' has been defined as 'ready to take place, near at hand, impending, hanging threateningly over one's head, menacingly near.'" *Henley v. State*, 493 S.W.3d 77, 89 (Tex. Crim. App. 2016) (quoting *Devine v. State*, 786 S.W.2d 268, 270 (Tex. Crim. App. 1989)). "Thus, imminent harm is harm that is ready to take place—harm that is coming in the very near future." *Id.* "Logically, then, if conduct is 'immediately necessary' to avoid harm that is imminent, that conduct is needed right now." *Id.* "Harm is imminent when there is an emergency situation and it is 'immediately necessary' to avoid that harm." *Pennington v. State*, 54 S.W.3d 852, 857 (Tex. App.—Fort Worth 2001, pet. ref'd). "In other words, a split-second decision is required without time to consider the law." *Id.* "Evidence of a generalized fear of harm is not sufficient to raise the issue of imminent harm." *Brazelton*, 947 S.W.2d at 648; *see also Stefanoff v. State*, 78 S.W.3d 496, 501 (Tex. App.—Austin 2002, pet. ref'd).

The second prong of the necessity defense requires evidence that the harm the defendant sought to avoid clearly outweighed the harm the statute seeks to avoid, according to "ordinary standards of reasonableness." *See* Tex. Penal Code § 9.22(2); *Wood v. State*, 271 S.W.3d 329, 335 (Tex. App.—San Antonio 2008, pet. ref'd). The phrase "'ordinary standards of reasonableness' may be defined as the standards that an ordinary and prudent person would apply to the circumstances that the actor faced." *Williams v. State*, 630 S.W.2d 640, 643 (Tex. Crim. App. 1982). This requirement serves "to facilitate the desired balancing of harms on a case-by-case basis." *Id.* at 643 n.2. The reasonableness inquiry is a fact question for the jury

to decide and should be viewed from an accused's standpoint at the time she acted. *See Pennington*, 54 S.W.3d at 857.

**Coolbaugh raised the defense of necessity**

Viewed in the light most favorable to the requested instruction on necessity, the evidence shows that before Coolbaugh drove while intoxicated, Coolbaugh's boyfriend assaulted her at his house in Austin. She was asleep on the bed when he awakened her by choking her and grabbing her by the back of her hair. The choking was prolonged enough that Coolbaugh recalled losing her breath as he screamed at her about a message on her phone from another man. When he stopped choking her, the assault continued. As Coolbaugh tried to catch her breath, her boyfriend "grabbed [her] shoes and keys on the ground, and he grabbed [her] hair and he dragged [her] out of the house and just kept hitting [her] with shoes and just kept dragging [her] to the sidewalk." Coolbaugh testified that he "had the back of her hair" and that he "just kept screaming" at her and "wouldn't stop" hitting her, even though she "kept telling him he was hurting [her]." He then hit Coolbaugh in the face, which caused her to collapse on the ground and "black out." When she regained consciousness, she saw her boyfriend sitting outside on his porch. It was then that Coolbaugh grabbed her car keys, shoes, and phone, which her boyfriend had thrown on the ground, and decided to get in her car, which was "parked right at the street where [she] was laying." She "thought that was her way to get out" of the situation. However, getting in her car did not stop her boyfriend from coming after her. She testified that he "came running back at [her], and he was jumping on the car and hitting the windows really hard," so much so that Coolbaugh "thought he was going to break the windows." She added that he was "screaming at [her] that this wasn't over, it's not over till he says it's over" and that "he was

9

coming for [her]." At that point, Coolbaugh "started the car and [she] backed up really fast and went out." When Coolbaugh was later stopped by the police, she was upset and crying, and one of the officers noticed that she had blood in her eye and bruising on her cheek.

We conclude that the above provides some evidence that Coolbaugh had a reasonable belief that driving while intoxicated was immediately necessary to avoid imminent harm. Coolbaugh had just suffered a vicious assault by her boyfriend, and it appeared that he was not done assaulting her. He had awakened her on the bed and choked her to the point where she had been unable to breathe and had hit her hard enough that she had lost consciousness on the ground outside his house, after he had dragged her outside by pulling her there by her hair. When she regained consciousness, her boyfriend was still outside and within her view, sitting on the porch, and when she got into her car, hey boyfriend came after her again, jumping on her car, hitting the windows, and screaming at her that "this wasn't over" and that he was "coming for her." This was more than a "generalized fear of harm." This was at least some evidence of an "emergency situation" that required a "split-second decision" by Coolbaugh. She could either stay where she was and let her boyfriend continue the assault, or she could escape her assailant by driving away. She chose to escape. On this record, we cannot conclude that it was unreasonable as a matter of law for Coolbaugh to believe that under these circumstances, driving while intoxicated was immediately necessary to avoid imminent harm.

Similarly, we cannot conclude that it was unreasonable as a matter of law for Coolbaugh to believe that the desirability and urgency of escaping the assault clearly outweighed the harm from driving while intoxicated. Coolbaugh had already been choked to the point of being unable to breathe and beaten to the point of losing consciousness. The assault did not appear to be over when she drove away, as her boyfriend was jumping on her car, hitting the car

10

windows with enough force that she feared they might break, and threatening to "come after" Coolbaugh. It was for the jury to decide, according to "ordinary standards of reasonableness," if an ordinary and prudent person under these circumstances would have left the residence in her car as Coolbaugh did. *See Wood*, 271 S.W.3d at 335-36.

On appeal, the State makes various arguments as to why Coolbaugh's actions were not reasonable under the circumstances. The State asserts that any imminent harm had "evaporated" by the time Coolbaugh was stopped south of New Braunfels, that she had begun to feel safe as soon as she got in her car and began heading home, and that she did not know whether her boyfriend was in fact following her. The State also contends that Coolbaugh presented no evidence that it was necessary for her to drive through several counties in route to her home in Schertz because, in the State's view, other reasonable alternatives were available. The State suggests, for example, that Coolbaugh could have stopped at a police station, stopped somewhere else to ask for help, or called someone for help, including 911. However, these are arguments for the jury to consider when determining the reasonableness of Coolbaugh's conduct under the circumstances. They fail to establish, as a matter of law, that Coolbaugh was not entitled to a necessity instruction. *See Pennington*, 54 S.W.3d at 859-60 (explaining that although "evidence of the availability of legal alternatives may be relevant" to reasonableness determination, "the unavailability of legal alternatives is not a requirement of the defense of necessity"). Moreover, we are to consider the evidence from Coolbaugh's standpoint at the time she acted: it was hours after midnight, she knew of nowhere safe between Austin and Schertz where she could stop at that time, and her phone was not functioning properly.

The State also relies on an unpublished opinion out of the Thirteenth Court of Appeals, *Torres v. State*, No. 13-98-372-CR, 2000 WL 34251147 (Tex. App.—Corpus Christi-

11

Edinburg Aug. 10, 2000, no pet.) (not designated for publication). In that case, Torres got into a fight with her boyfriend at his house after they had spent the day at a beach drinking alcohol:

> It [was] controverted as to who started the fight, but [Torres] did throw a bucket full of water at [her boyfriend], and [her boyfriend] pushed [Torres] to the ground. After these incidents and a continuous exchange of words, [Torres's boyfriend] asked [Torres] to leave his home and called the police. [Torres] was packing her car when the police arrived. [Torres] told the police officer she was leaving and then proceeded to leave [her boyfriend's] residence with her daughter at approximately 9:10 p.m.

*Id*. at *1. When Torres left her boyfriend's residence, "her intention was to return to San Antonio," but she "stopped in Victoria at a convenience store about 10:00 p.m. to get gas and to make a telephone call to a friend in San Antonio to let him know she was returning to San Antonio." *Id*. Torres then returned to Highway 87, where she got into a collision with another vehicle, causing the death of a passenger inside that vehicle. *Id*. Torres was charged with intoxication manslaughter. *Id*.

At trial, Torres requested an instruction on the defense of necessity. She argued that "it was necessary for her to drive intoxicated to escape violence" from her boyfriend:

> [Torres] testified she believed [her boyfriend] would try to harm her after their fight, and she felt the need to protect herself and her daughter by leaving his house and the potentially violent situation, even though she did not want to drive after she had been drinking. [Torres] further testified that she was so frightened after the physical altercation with [her boyfriend] that she feared he might follow her and try to harm her. [Torres] did not approach any law enforcement officers because she feared they might side with [her boyfriend] and protect him since he also was a police officer.

*Id*. at *2-3.

12

The trial court denied Torres's request for a necessity instruction, and the appellate court affirmed. The court placed significance on her stopping at a convenience store before the accident:

> Because at least forty-five minutes had elapsed from the time [Torres] left [her boyfriend's] house and the time she stopped for gas, we conclude the situation did not involve an emergency within which [Torres] was called on to avoid harm to herself by driving while intoxicated. Rather, we conclude [Torres] had plenty of time to consider her options. Because [Torres] had the opportunity to assess the situation when she stopped for gas and determine that [her boyfriend] was not following her and that he did not pose a threat of imminent harm, [Torres] could have chosen another course rather than continuing to operate her vehicle in an intoxicated state.

*Id*. at *3.

The State notes certain similarities between *Torres* and the case here: Coolbaugh, like Torres, had been driving for a significant amount of time; she did not know whether her boyfriend was following her; and she intended to drive all the way to her home in Schertz, just as Torres had intended to drive to her home in San Antonio. However, there are also significant differences between the two cases. In *Torres*, the fight between Torres and her boyfriend had stopped before she left his residence, and police had arrived at the residence before she drove away. Thus, whatever violence Torres might have faced earlier, no such violence was "imminent" when she left her boyfriend's residence. As Torres testified, she "felt the need to protect herself and her daughter by leaving his house and the *potentially* violent situation." *Id*. (emphasis added). In contrast, Coolbaugh testified that at the time she left her boyfriend's residence, she was leaving an ongoing violent situation and had already suffered injuries from her boyfriend's assault. Moreover, although Coolbaugh did not know if her boyfriend was following her, he did tell her before she left that he was "coming after her," and, according to

13

Coolbaugh, he sent her text messages to that effect and "was constantly calling" her "every time [she] tried to look at the phone." Thus, there was some evidence that Coolbaugh's boyfriend remained a threat to her even after she left his residence. There was no such evidence regarding Torres's boyfriend. Also, we find it significant that when Torres left her boyfriend's residence, it was approximately 9:10 p.m. *Id*. As a result, Torres was able to stop at a convenience store, get gas, and phone a friend at approximately 10:00 p.m. *Id*. Although we do not know the specific time that Coolbaugh left her boyfriend's residence, we know that she was stopped south of New Braunfels at approximately 3:30 a.m., which means, when viewing the evidence in the light most favorable to Coolbaugh, that she likely left South Austin at some time after 2:30 a.m., with a phone that did not function properly. Thus, Coolbaugh did not have the same "opportunity to assess the situation" as Torres did. Because of these and other differences, and because of its lack of precedential value, *see* Tex. R. App. P. 47.7, we are not persuaded that we should follow *Torres* here.

We conclude that the evidence summarized above, including but not limited to Coolbaugh's testimony, is sufficient to raise the defense of necessity. The reasonableness of that defense was a fact question for the jury to decide. *See Maciel*, 631 S.W.3d at 725; *Wood*, 271 S.W.3d at 335-36; *Pennington*, 54 S.W.3d at 858; *Brazelton*, 947 S.W.2d at 649; *Spakes v. State*, 891 S.W.2d 7, 8, 11 (Tex. App.—Amarillo 1994), *aff'd*, 913 S.W.2d 597 (Tex. Crim. App. 1996); *see also Wright v. State*, No. 05-09-00421-CR, 2010 WL 2560536, at *5 (Tex. App.—Dallas June 28, 2010, no pet.) (mem. op., not designated for publication); *Juarez v. State*, No. 12-08-00009-CR, 2009 WL 768595, at *4 (Tex. App.—Tyler Mar. 25, 2009) (mem. op., not designated for publication), *aff'd*, 308 S.W.3d 398 (Tex. Crim. App. 2010). Accordingly, the trial court erred when it failed to instruct the jury on the defense of necessity.

14

The State has filed a motion for rehearing in which it contends, among other arguments that we have already considered, that the defense of necessity is not applicable as a matter of law to the offense of driving while intoxicated. In making this argument, the State cites to two older cases from the Court of Criminal Appeals that held that the defense of necessity was not available to DWI defendants. *See Sansom v. State*, 390 S.W.2d 279, 279 (Tex. Crim. App. 1965) ("If appellant here is found in a predicament, it is of his own doing, and he may not by such conduct claim the benefit of a defense to which he is not entitled."); *Butterfield v. State*, 317 S.W.2d 943, 943 (Tex. Crim. App. 1958) ("We are aware of no such defense and decline to hold that an intoxicated driver of an automobile upon a public highway commits no offense if it be shown that a necessity existed, or that it appeared to him to be necessary that he make the journey."). Both cases predate the 1974 codification of the necessity defense in the Texas Penal Code. *See* Tex. Penal Code § 9.22. However, the State asserts that the necessity defense continues to be unavailable in DWI cases because of the third statutory requirement of the defense, that conduct is justified only if "a legislative purpose to exclude the justification claimed for the conduct does not otherwise plainly appear." *See id*. § 9.22(3). According to the State, a legislative purpose to exclude the justification plainly appears because, in its view, the DWI statute does not criminalize "conduct," which the Penal Code defines as "an act or omission and its accompanying mental state." *Id*. § 1.07(a)(10). Because DWI is a strict liability crime, no mental state is required to commit the offense. *See Farmer v. State*, 411 S.W.3d 901, 905 (Tex. Crim. App. 2013). Thus, the State reasons that because the DWI statute does not contain a mens rea requirement, it does not prohibit "conduct" but merely the "act" of operating a motor vehicle while intoxicated in a public place. *See* Tex. Penal Code § 49.04(a).

We disagree with the State that the DWI statute does not prohibit "conduct." The absence of a mens rea requirement simply means that the conduct prohibited by the statute is the act alone. *See Fleming v. State*, 455 S.W.3d 577, 581 (Tex. Crim. App. 2014). It does not mean that the legislature intended that the necessity defense be inapplicable as a matter of law to the act of driving while intoxicated. In fact, the Court of Criminal Appeals recently held that a DWI defendant was entitled to an instruction on the necessity defense. *See Maciel*, 631 S.W.3d at 725. The court recognized that "DWI is a strict liability crime, meaning that it does not require a specific mental state." *Id*. at 724. Nevertheless, the court concluded that the defendant was entitled to the requested instruction on necessity based on the evidence in that case.[2] *Id*. at 722. For the reasons discussed above, we reach the same conclusion based on the evidence in this case.

**The lack of an instruction harmed Coolbaugh**

When the defendant preserves a jury charge error at trial, as was the case here, the reviewing court must reverse if the error caused some harm. *See Jordan v. State*, 593 S.W.3d 340, 346-47 (Tex. Crim. App. 2020). "'Some harm' means actual harm and not merely a theoretical complaint." *Id*. at 347. There is no burden of proof associated with the harm evaluation. *See Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013). "Reversal is

---

[2] The specific issue in *Maciel* was whether the defendant had sufficiently admitted to committing the offense of DWI, which is a prerequisite to "confession and avoidance" defenses such as necessity. *See Maciel v. State*, 631 S.W.3d 720, 722-23 (Tex. Crim. App. 2021). The court concluded that she had. *Id*. at 725-26. Although that was not the issue in this case (the parties did not dispute that Coolbaugh had admitted to driving while intoxicated), we find it significant that the court concluded that the necessity defense could be available to a DWI defendant, depending on the facts of the case, rather than concluding, as it had in its earlier opinions, that the defense was not available in DWI cases as a matter of law.

16

required if the error was calculated to injure the rights of the defendant." *Jordan*, 593 S.W.3d at 347. The harm evaluation is case-specific and entails a review of the whole record, including the jury charge, contested issues, weight of the probative evidence, arguments of counsel and other relevant information. *See id.* Failure to instruct on a confession-and-avoidance defense, such as necessity, is rarely harmless "because its omission leaves the jury without a vehicle by which to acquit a defendant who has admitted to all the elements of the offense." *Cornet v. State*, 417 S.W.3d 446, 451 (Tex. Crim. App. 2013).

Here, Coolbaugh admitted in her testimony that she drove while intoxicated. Thus, the court's charge, absent a necessity instruction, effectively left the jury with no choice but to convict Coolbaugh of that offense, despite her extensive testimony providing a detailed explanation for why she committed that offense. Moreover, this was not a case in which the evidence relevant to the necessity defense was limited to Coolbaugh's testimony. As noted above, in a video recording of the traffic stop taken from Officer Flugrath's patrol car dash camera, Coolbaugh can be heard crying and describing the assault, and in photographs admitted into evidence, Coolbaugh can be seen with blood in her eye and bruising on her cheek, which the jury could have reasonably inferred were consistent with an assault. Nevertheless, the State argued in closing that the jury could not consider the evidence that had been presented regarding the assault in reaching its verdict:

> There ha[ve] been questions and testimony in regards to an alleged assault, and we are not here today to determine guilt or innocence for that. . . . Ms. Coolbaugh is on trial today. Ms. Coolbaugh is the one that made a series of choices on April 22nd of 2017. Ms. Coolbaugh chose to get behind the wheel of a vehicle. . . . She told you. She got up there and she told you.
>
> . . . .

17

> The defense got up here and . . . continuously says things like beat, assault, drug out, bruised. Why does the defense do this? It's a roundabout way to get you to consider cutting her loose for this DWI charge. While there are some unfortunate events that took place that night, necessity is not a legal excuse for this particular case. That's why you don't see it in the jury charge. What happened in Austin can now only be considered an event that happened before her arrest. You must follow the language of the jury charge and let that govern your decision. Any thoughts you may have about the assault are just that at this point, they're thoughts. They're not applicable in this case.

Thus, the State directed the jury to the court's charge, and the charge left the jury without a means to acquit Coolbaugh, even if the jury had believed her. On this record, we conclude that Coolbaugh suffered some harm from the trial court's failure to charge the jury on necessity.

## CONCLUSION

We reverse the judgment of the trial court and remand for further proceedings consistent with this opinion.

_____
Gisela D. Triana, Justice

Before Chief Justice Byrne, Justices Triana and Theofanis

Reversed and Remanded on Motion for Rehearing

Filed: October 20, 2023

Do Not Publish

18